Filed 3/17/14  Marriage of G. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Marriage of ELIZABETH and GREGORY G. | B236719 |
| ELIZABETH G.,<br><br>        Appellant,<br><br>    v.<br><br>GREGORY G.,<br><br>        Respondent. | (Los Angeles County<br>Super. Ct. No. BD442597) |

APPEAL from an order of the Superior Court of Los Angeles County, Elizabeth R. Feffer, Judge.  Reversed.

Honey Kessler Amado and Erin Michelle Bogle for Appellant.

Jeffrey C. Briggs for Respondent.

_____

## INTRODUCTION

In this appeal, a mother challenges the trial court's order granting her former spouse a restraining order against her pursuant to the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq),[1] which includes the provision that she may have no contact whatsoever with their six-year-old son for a period of five years. We reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

Elizabeth G. and Gregory G. were married in March 2005, their son Jack G. was born in July 2005, and Elizabeth and Gregory separated in March 2006.[2]

In August 2006, after several days of hearings on Elizabeth's request for temporary restraining orders and Gregory's motion for an independent medical examination, the trial court (Hon. Ann Dobbs) made a number of findings, including the following: "Each party has had addiction and/or psychological difficulties in the past." Elizabeth had a psychiatric hospitalization about 13 years earlier (in 1993), and about seven years earlier, she was referred to Dr. Phillip Bowman for depression. He prescribed Effexor, which Elizabeth continued to take; she had been on other medications in the past but stopped taking some of these because of her pregnancy. She continued to see Dr. Bowman every six months and was in therapy with Dr. Linda Mayer. Three years earlier (in May 2003), Gregory was hospitalized for about one month for "problems of addiction" at Sierra Tucson. Six years earlier (in 2000), he had been hospitalized at Cottonwood Tucson.

---

[1]    Further statutory references are to the Family Code unless otherwise indicated.

[2]    Pursuant to the requests of both parties, the trial court ordered certain portions of the reporter's transcript filed under seal and also conducted closed or private hearings pursuant to section 214 (although we note that much of the same information treated as confidential in the reporter's transcripts is also contained in other portions of the record not subject to the same protections as well as the parties' briefing). In any event, because this matter involves a minor innocently involved in these appellate proceedings (and his parents share the same last name), we refer to each of them using first name and last initial only to protect the minor's identity.

The court found there was insufficient evidence Gregory was an alcoholic or that he had an anger management problem. In fact, the court observed, Elizabeth's anger had been more apparent in the proceedings.

There was no verification before the court that either party had had recent psychiatric or psychological problems requiring "severe measures or hospitalization."

Both parties were at fault for being banned from the Beverly Hills Police Department for custody exchanges, but according to one officer's testimony, Elizabeth was "the provocateur in most instances."

At that time, the court specifically found: "Both parents are good parents."

Pursuant to the court's 2006 order, Gregory was to continue to have sole legal custody of Jack but was required to give notice to and confer with Elizabeth regarding Jack's health, education and welfare. The parties were to share physical custody of Jack equally on a two day-two day basis, with exchanges to be monitored by a professional monitor to provide "no-conflict, no-hassle exchanges for the child."

There were orders for both parties to continue to see their respective therapists, with Elizabeth to be assessed for other medication, as she would not be breastfeeding Jack any longer. In addition, the parties were to continue to participate in co-parenting counseling. The order included mutual restraining orders, and the parties were to communicate solely by e-mail.

As of December 27, 2006 (pending a review hearing in February 2007), however, Gregory had been awarded primary physical custody, with Elizabeth to have visitation with Jack from 5:15 p.m. on Wednesdays to 5:15 p.m. on Thursdays, and alternating weekends from Friday at 5:15 p.m. through Sunday at 5:15 p.m. The court found a "change of circumstance as a result of [Elizabeth's] failure to follow court orders."

Pursuant to the parties' agreement set forth in the Partial Further Judgment on Child Custody filed in November 2007, Gregory was to have sole legal custody and primary physical custody of Jack, except during times designated for Elizabeth's visitation with Jack, namely on alternating weekends from Fridays at 4:00 p.m. through

3

Sundays at 4:00 p.m. and every Tuesday from 4:00 p.m. to Wednesday at 4:00 p.m. (as well as specified holiday and vacation time). The judgment further provided that Elizabeth would be entitled to additional time with Jack if she complied with certain conditions, including her participation in conjoint therapy for at least six sessions, pay one-half of the fees for conjoint therapy and pay in full the fees due another doctor and otherwise comply with the court's orders.

In March 2009 (following an order to show cause hearing in February), the trial court denied Elizabeth's request for modification of child custody (as well as child support and for attorney fees). Then in May, following a March hearing on Gregory's request for an order to show cause regarding Elizabeth's compliance with court orders, the court (Hon. Elizabeth Feffer) ordered: "Until the court specifically Orders that [Elizabeth] has complied with the provisions of the Partial Further Judgment on Child Custody filed November 14, 2007, or stipulation of the parties, the step-up will not take effect and [Elizabeth's] visitation with the minor child [Jack] shall remain as set forth in . . . the Partial Further Judgment . . . [providing for alternating weekends and Tuesday afternoon through Wednesday afternoon]." According to the tax return she filed for 2009, Elizabeth reported income in the amount of $11,249 that year.

On August 14, 2009, Gregory made an ex parte application for an order to show cause re modification of visitation such that Elizabeth would have "only monitored visitation" with Jack—by a professional monitor or through the S.A.F.E. program, with Elizabeth to be responsible for all costs associated with the monitor.[3] In his declaration, Gregory said that, shortly after the May 2009 order was filed, he learned Elizabeth had

---

[3] The ex parte application refers to the declarations of Gregory, other family members and his counsel for the facts in support of the order requested, but the case information refers only to the application, declaration re notice and order, and there are no supporting declarations accompanying the ex parte application in the record. However, Gregory's declaration dated August 13, 2009, is attached as an exhibit to his subsequent ex parte request for domestic violence protection order. (§ 6200.)

4

contacted the Los Angeles County Department of Children and Family Services (the Department) and "made false allegations against [him]." He said he had been informed Elizabeth had contacted a "mandated reporter" who then contacted the Department as well as law enforcement. He said Elizabeth reported that, while she was bathing with Jack, Jack "told her to close her eyes and stuck his finger in her vagina." She had also said that, after the bath, Jack was lying down and "said something to the effect of 'eat me[,] mom'" and when she asked where he learned this, "he responded 'Daddy.'"[4] He said he was "appalled" when he heard about the allegations and "horrified to discover Elizabeth had been bathing naked with our four-year-old son" as "this behavior is inappropriate."

As an exhibit to his declaration, Gregory submitted a letter from the Department addressed to both parents (dated July 31, 2009), stating that its investigation of child abuse allegations involving Jack were "closed[.]" A May 2009 referral for sexual abuse by Gregory as well as a May 2009 referral for sexual abuse by Elizabeth were both deemed "Unfounded[.]" However, the Department's social worker informed both parents as follows: "Due to the high conflict in your relationship with each other, emotional abuse by parents was considered, but not added. . . . At this time, Jack does not manifest evidence of harm, as by negative symptoms or behaviors, as a result of parents' conduct[,]" but "[o]ne contact perceived that while both of you love your child, your hatred for each other is greater . . . ." She cautioned both Gregory and Elizabeth: "If this pattern of your conflict continues, you risk intervention by the Dependency Court." After making a number of suggestions and recommendations, the social worker concluded: "Jack is a bright, good natured child who will benefit from getting the best of each of you as his Mom and Dad."

---

[4]    Gregory said he would "sometimes kiss and tickle [Jack's] tummy while saying 'I'm gonna eat you, I'm gonna eat you' which makes Jack laugh and squeal in delight."

In addition, Gregory said in his declaration that Elizabeth refused to return Jack to him after the July 12, 2009, visit when no monitor was present and she told the police Gregory had called her and threatened to kill her that same day (which he denied).

At the ex parte hearing (August 14), Elizabeth's counsel told the court he had just received Gregory's papers as he walked into the courtroom and requested an opportunity to prepare a defense with a hearing date set for a noticed motion, but the trial court rejected the request and proceeded to hear testimony in a closed hearing (at Gregory's request pursuant to section 214, with transcripts filed under seal at both parties' request).[5]

According to Elizabeth's testimony that day (August 14), while Jack was taking a bath on May 26 (when he was three years, 10 months of age), she took off her clothes and got into the bath behind him to wash his hair from the back as she usually did. She said she did not think anything of it; she had been doing so since Jack was younger, and he never turned around. On this day, however, she said he turned around and "tried to get down" and said, "Mom[,] close your eyes." She said, "No, honey[,] what are you doing?" He answered, "I'm playing coco head game." According to Elizabeth, Jack said "Daddy" taught him and then said, "Shh, don't talk about it." He "quickly" tried to reach his finger toward her vagina, she said, and she "put his hand back" and got out of the tub, but "he just sort of touched me there" before she could get out. "It happened so fast," she said several times.

Elizabeth testified that after she got out of the tub, she said, "No one is to touch your private parts. You don't touch Mommy's or anybody's private parts." She had talked with him about this before. Then "he went and laid on his bed and raised his legs above his head and spread his anus open and said, 'Mom[,] eat me.'"

---

[5]     Elizabeth's counsel (Larry David) told the trial court he had only received notice that Gregory would seek monitored visitation at Elizabeth's expense. Although Gregory's counsel's office said "they would try to fax them or e-mail [the supporting papers] to him last night," he said he had waited until 9:00 but never received anything.

After conferring with a friend who was also an emergency room nurse (Michelle Baldi), Elizabeth said, she took Jack to UCLA where he was questioned; local police and the Los Angeles County Department of Children and Family Services (the Department) were contacted as well.

While Elizabeth was testifying, the trial court said, "hearing she is in the tub naked with a four-year-old boy, and she allows him to stick his finger in her vagina—" Elizabeth interjected, "I didn't allow him." The trial court responded, "You didn't stop him. Elizabeth said, "I did stop him. It happened so fast, Your Honor." The trial court told Elizabeth she had "said enough" for the court to be "concerned" and granted Gregory's ex parte application, ordering Elizabeth's visitation to be monitored by a professional monitor at Elizabeth's expense. When Elizabeth's counsel responded that she could not afford to pay for a professional monitor, Gregory's counsel said "the SAFE program" operated on a sliding scale and allowed two hours, once per week. The trial court set a September hearing date to provide "an opportunity for [Elizabeth] to submit a written response," but said "certainly it's in the child's best interest to have supervised visitation with [Elizabeth]."

Prior to the September hearing, Elizabeth filed opposition, accompanied by her own declaration stating that when she received ex parte notice that Gregory wanted to limit her visitation with Jack to professionally monitored visitation, she was "extremely stressed by this knowledge." The next morning, she had not yet seen Gregory's supporting papers; she saw the attorney she had just retained to represent her pro bono receive them five minutes before the scheduled appearance time. When the trial court began questioning her directly, given the purpose of Gregory's application, she said she "became anxious to the point where [she] could not rationally respond . . . ."

She again recounted the events when she and Jack "were in the bathtub together nude." She added that, when Jack was saying "Just close your eyes, don't talk about it, don't talk about it[,]" she had been holding onto Jack's arms and then let go so she could use her own arms to get out of the tub, and that was when he reached for and "slightly"

7

touched her; as soon as she balanced herself, she said, she grabbed his hand away, got out and put her robe on.

At the conclusion of the September hearing, the trial court stated: "I do note that the evidence presented in [Elizabeth's] declaration is different than what was presented to the court. [¶] I know she stated she didn't provide the full version to the court, but the facts are materially different to raise significant concerns about [her] veracity. If not of her veracity then her ability to accurately reflect and recall incidents. [¶] The court has serious doubts about [Elizabeth's] ability to accurately relate facts as they occur. It is in the best interest of the child to continue with monitored supervision with [his] mother . . . under . . . section 3027[,] and the court proposes the same schedule that was awarded on an ex parte basis when the parties were last here"—monitored visitation at Elizabeth's cost.[6]

Elizabeth's counsel told the trial court that "although the court was kind enough to waive fees for the SAFE program," he had a letter from the program indicating "they don't have any room for freebies any longer, and they will notify her when they do—" The court interjected "to the extent she can pay, it's a sliding scale program . . . ." Gregory's counsel said, "That's correct, and she is on the waiting list." The court then said, "[T]hen the phone calls can continue as before." When Elizabeth's counsel said "the phone calls in the judgment were only for vacation periods," the court responded "those are to continue," confirming that unless the parties stipulated to some other agreement, "there are no phone calls unless it's vacation."

Thereafter, Elizabeth (representing herself) filed a number of applications for orders to show cause (as she had done since entry of the 2007 judgment) seeking

---

6 "If allegations of child abuse, including child sexual abuse, are made during a child custody proceeding and the court has concerns regarding the child's safety, the court may take any reasonable, temporary steps as the court, in its discretion, deems appropriate under the circumstances to protect the child's safety until an investigation can be completed." (§ 3027, subd. (a).)

additional time with Jack, to remove the monitor and to enforce the visitation orders.  Her requests were denied each time.

At some point, Elizabeth began to have monitored visits with Jack; Professional Monitoring Services provided the supervision from at least October 2010 until early April 2011, and indicated in reports that interactions between Elizabeth and Jack were positive.

In early April 2011, the monitor (Chiquita Brown) documented a visit between Elizabeth and Jack at a local park.  The two had lunch and Jack played on the park equipment.  When Jack told Elizabeth he needed to use the restroom, the monitor accompanied them both to the restroom, but on the way, Jack told Elizabeth he had already "used the restroom in his pants."  Elizabeth "reassured [him] that accidents happen" and got a change of clothes for him.  The monitor (Brown) stood inside the stall door as Elizabeth changed Jack out of the pants and underwear he had been wearing and began to clean him.  When she saw "red welts and scratches on [Jack's] left buttocks cheek and asked [him] how he'd received the marks[, Jack] said that his dad [Gregory] had spanked him [Jack] that morning before the Monitor and [Elizabeth] arrived."  When Elizabeth asked why, Jack said "he was spanked because he [Jack] went into his dad's bedroom."  The monitor said she had been "present during the entire engagement and also observed three red approximately 1 ½ " welts on [Jack]'s left buttock cheek."

According to the monitor's report, after Elizabeth changed Jack, she said she was going to take him to the hospital or the police station to file a report because she believed there had been child abuse in the past.  Of the two, the monitor suggested the police department.  She then accompanied Elizabeth and Jack to the Hermosa Beach Police Department where the clerk recognized Elizabeth as she "had apparently also made" a child abuse report before.  A police officer met with Elizabeth to get a statement and interviewed Jack in the monitor's presence.  In the monitor's presence, the officer allowed Elizabeth to use a police department camera to photograph Jack's injuries.  The officer kept the camera in his possession and prepared a report, indicating that because the incident took place in the "LAPD-WLA area," he would forward the report.

9

The following day, the matter was referred to the Department.[7]

According to an email Elizabeth prepared the day after that, Professional Monitoring Services told her (apparently after receiving a letter from Gregory's attorney), "'all visits are canceled.'"

Thereafter, in May 2011, Elizabeth posted "A Petition to Re-unite Elizabeth and Jack G[.], her 5[-]year-old Son" on the internet. Elizabeth identified the Unites States Congress as the intended "[t]arget" of the petition, stating she had not seen Jack for more than 28 consecutive days. During their marriage, Elizabeth said Gregory had verbally, physically, mentally and emotionally abused her so she was forced to leave to protect herself and her son. She said she discovered Gregory had "an extensive history of drug abuse and during the marriage, he abused alcohol. In addition, Jack's father is diagnosed with Anti-Social Personality Disorder, Narcissism and Sadism by one of his doctors in one of his many drug rehabilitation centers." She said she had lost custody of Jack "completely for **no reasons** but a corrupt bias[ed] judge assisting a vindictive wealthy husband['s] reckless actions."

According to the petition, "Jack was left in full sole and legal custody of his father who is physically, emotionally and mentally abusing him while Elizabeth who is a caring and a perfectly fit mother was ordered by Judge Elizabeth Feffer to be monitored by professionals only to break her emotionally and financially." The result, she said was that both mother and child had suffered "deep ongoing trauma." She said she and Gregory had shared custody until Jack confessed his father had "touched [him] inappropriately." Confused and troubled, Elizabeth reached out to professionals she said, only to be dragged into court the day after Gregory threatened her with monitored visitation, and accused her of making false allegations. He "misused his wealth" to take away her "ability to connect with her son as she was forced to pay $9,600 a month to be 'monitored' to see her son." After Jack confessed to the police that his father was

_____

[7] Later the next month, the referral was closed, with the allegation of child abuse determined to be "inconclusive."

10

beating him, Elizabeth wrote, "Jack's father terminated ALL visitations with Elizabeth." She said Jack had nearly died of a ruptured appendix while in his father's care and that Jack reported he was "continuously being physically, mentally and emotionally abused" by his father and his father's nanny. Elizabeth wrote that professional monitors had noted no need for her visits to be monitored and said she had made numerous attempts and requests to the court to lift the orders restricting her visits which she said harmed her son. She said the "appeals process is lengthy and expensive" and Jack could not wait another day to be reunited with his mother. She said Gregory had a "powerful attorney" and said the trial court's orders were "inappropriate and bias[ed]" and contrary to Jack's best interests.

Two weeks after Elizabeth posted her petition, in May 2011, Gregory filed a request for restraining order against Elizabeth, seeking personal conduct, stay-away and new custody orders. More particularly, he requested an order that Elizabeth could not "harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, or block movements" of Gregory or Jack, and that she be ordered to remain at least 100 yards away from them, their home and Jack's school. In addition, he wanted Elizabeth to be enjoined from discussing any matters pertaining to Jack, Gregory or the court proceedings with anyone, except as required by law enforcement, the Department or her own attorney and that she be enjoined from distributing any documents pertaining to Jack or the court proceedings, including petitions, records, photographs or court records to any third party, including Jack's teacher[ and] principal, except as required by law enforcement, the Department or her attorney; and that she be enjoined from posting anything about Gregory, Jack or the court proceedings on the Internet.

Finally, Gregory requested that Elizabeth be allowed "no visitation" with Jack.

Gregory cited the petition posted on the Internet and the third investigation by the Department and alleged Elizabeth had appeared in a car outside his house once, had

11

bathed Jack during monitored visits which he said violated court orders and had distributed photographs of Jack's buttocks to his teacher and principal.

The trial court granted a temporary restraining order against Elizabeth, on all terms Gregory requested (including the bar on all visitation), pending a further hearing on the request for a permanent restraining order.

Elizabeth sought to present testimony from several witnesses, including the principal at Jack's school (Judy U.) regarding Elizabeth's positive influence on Jack at school and Jack's kindergarten teacher (I.S.) who Elizabeth said would testify Jack did better in school when Elizabeth was allowed to volunteer in his classroom. The trial court rejected the proposed testimony as irrelevant to the domestic violence proceeding.

The assistant principal (Jeannie M.) had come to court to testify that neither the petition to Congress nor the photographs had been circulated at school, but her testimony was disallowed as well.

In addition, Elizabeth sought to present the testimony of Paula Correia, one of the visitation monitors, who would testify the teachers and school staff all said Jack was doing better as a result of Elizabeth's involvement in his class. Again, the trial court concluded her testimony was irrelevant to the domestic violence restraining order.

Further, Chiquita Brown was prepared to testify regarding the events of April 10, 2011, when she observed the welts on Jack's buttocks and accompanied Elizabeth to the police department, but the trial court said the purpose of the proceedings was not to make a finding of child abuse.

Following several court days of hearing, in which Elizabeth, Gregory and Gregory's cousin testified (but Elizabeth's witnesses were excluded as irrelevant to the DVPA proceedings), the trial court granted the order.[8] The trial court found that Elizabeth's posting of her petition and distribution of photographs of Jack's bare buttocks amounted to "disturbing the peace" of Gregory and Jack because if Jack were to get a

---

[8] The court indicated issues relating to Jack's well-being could be addressed in future proceedings now held in abeyance pending this appeal.

bruise "from normal childhood activities or playing sports," Elizabeth would subject Jack to further investigation; Elizabeth had abused the terms of monitored visitation to Jack's detriment and furthermore, certain allegations were "patently false and inarguably violate[d] Jack's privacy" by discussing "his severe medical issues with the appendix."

The trial court issued a restraining order, including personal conduct and stay-away orders as requested, protecting Gregory and Jack for five years—with an expiration date in August 2016. Pursuant to the order, Elizabeth may not see or contact her son for five years.

Elizabeth appeals.

## *DISCUSSION*

Elizabeth raises several challenges to the Family Law court's order, including the claim that she was deprived of due process in being denied the opportunity to present evidence on the critical issues of abuse and her son's best interests. Relying almost exclusively on *Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483 (*Nadkarni*) as the "seminal case," Gregory says the trial court did not need to hear from Elizabeth's witnesses and properly limited the focus to the issues of harassment and disturbing the peace. We agree with Elizabeth that due process compels a complete reversal of the trial court's orders and therefore need not address her additional arguments.

*The DVPA and the Standard of Review.*

"The DVPA (§ 6200 et seq.) authorizes the trial court to issue a restraining order 'for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.' (§ 6300; see *Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 421 [67 Cal. Rptr. 3d 317].) A restraining order may issue under the DVPA either 'enjoining specific acts of abuse,' 'excluding a person from a dwelling,' or 'enjoining other specified behavior' and may issue ex parte, after notice and a hearing, or in a judgment. (§ 6218.)

"For purposes of the DVPA, '"abuse" means any of the following: [¶] (a)

13

Intentionally or recklessly to cause or attempt to cause bodily injury. [¶] (b) Sexual assault. [¶] (c) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (d) To engage in any behavior that has been or could be enjoined pursuant to Section 6320.' (§ 6203, italics added; see *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 [67 Cal. Rptr. 3d 286] (*Nakamura*).)

"Section 6320 provides in part that '[t]he court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members.' (*Id*., subd. (a); see *Nakamura, supra*, 156 Cal.App.4th at p. 334.)

"A DVPA restraining order may be issued in an independent action brought by a former spouse who has been the subject of abuse within the meaning of the DVPA. (§§ 6301, subd. (b) & 6211; *Nakamura, supra*, 156 Cal.App.4th at p. 335.) The procedure for obtaining an ex parte temporary restraining order is set forth in section 240 et seq. Under section 242, when an application for a temporary restraining order is granted, the order must include an order to show cause why a permanent restraining order should be granted and set a hearing date within 20 or 25 days.[ ] Before the hearing on the order to show cause, the trial court is required to 'ensure that a search is or has been conducted to determine if the subject of the proposed order has any prior criminal conviction' for certain felony and misdemeanor offenses, including a misdemeanor conviction involving domestic violence. (§ 6306, subd. (a).) If the criminal investigation reveals that the subject of the proposed order has been convicted of one of the offenses enumerated in section 6306, subdivision (a), the trial court must consider the conviction before deciding whether to issue a DVPA restraining order. (§ 6306, subd. (b).)" (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1494-1495.)

14

Section 6340 permits the issuance of a protective order under the DVPA if "failure to make [the order] may jeopardize the safety of the petitioner . . . ." (§ 6340, subd. (a); see also § 6320; and see *In re B. S.* (2009) 172 Cal.App.4th 183, 194.)

In *Nadkarni, supra,* 173 Cal.App.4th 1483, 1497, the court noted: "[S]ection 6320 broadly provides that 'disturbing the peace of the other party' constitutes abuse for purposes of the DVPA. The DVPA does not provide any definition for the phrase 'disturbing the peace of the other party,' and we therefore turn to the rules of statutory construction to determine the meaning of the phrase and whether [alleged] conduct . . . may constitute abuse within the meaning of the DVPA." The court concluded "the plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party." (*Ibid.*)

Leaving to one side the question of whether the conduct of which Gregory complains even comes within the meaning of the DVPA (see *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249), the trial court violated Elizabeth's due process rights in precluding the testimony she sought to present. Even in *Nadkarni, supra,* 173 Cal.App.4th 1483 (the case on which Gregory relies), the court commented: "In exercising its discretion to either allow or exclude oral testimony, however, the trial court should be guided by the constitutional principle that '[d]ue process guarantees '"notice and opportunity for hearing *appropriate to the nature of the case*."' [Citation.]'" (*In re Jesusa V.* (2004) 32 Cal.4th 588, 601 [10 Cal. Rptr. 3d 205, 85 P.3d 2].) Moreover, the trial court should be mindful that 'in light of the vulnerability of the targeted population (largely unrepresented women and their minor children), bench officers are "necessarily expected to play a far more active role in developing the facts, before then making the decision whether or not to issue the requested permanent protective order." [Citation.]' (*Gonzalez v. Munoz, supra*, 156 Cal.App.4th at p. 423.)" (*Nadkarni, supra,* 173 Cal.App.4th at pp. 1499-1500, original italics; see also *Elkins v. Superior Court* (2007) 41 Cal.App.4th 1337, 1363-1369 (*Elkins*).)

15

More importantly, however, subsequent to the 2009 decision in *Nadkarni, supra,* 173 Cal.App.4th 1483, the Legislature enacted section 217.[9] Section 217 provides as follows: "(a) At a hearing on any order to show cause or notice of motion brought pursuant to this code, *absent a stipulation of the parties or a finding of good cause* pursuant to subdivision (b), the court shall receive any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties. [¶] (b) In appropriate cases, a court may make a finding of good cause to refuse to receive live testimony and shall state its reasons for the finding on the record or in writing. . . ." (Italics added.)

Consequently, "at *any* Family Code OSC or motion hearing, absent the parties' stipulation otherwise or a finding of 'good cause' to hold otherwise [citation], the court '*shall receive* any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2013) ¶ 5:491, p. 5-193, citing § 217, subd. (a), emphasis added; see also Cal. Rules of Court, rule 5.113.) In other words, section 217 "*displaces* and indeed, renders *invalid* the former long-standing practice of family courts generally to decide OSC and motion matters (except for OSCs re Contempt) strictly on the basis of the moving and opposing papers (the written supporting and opposing declarations), leaving it to the court's sole discretion whether to take oral testimony or receive additional evidence at the hearing. [Citation.]

"Section 217 and [rule] 5.113 effectively extend to the parties at OSC and motion hearings the rights that the California Supreme Court concluded must be afforded the parties at contested family law trials leading to judgment [citation]. (*Elkins*[, *supra,*] 41 Cal.4th [at p.] 1355[, further citation omitted]—courts may not prohibit oral testimony or

---

9 Subdivision (c) of section 217 states: "(c) A party seeking to present live testimony from witnesses other than the parties shall, prior to the hearing, file and serve a witness list with a brief description of the anticipated testimony. If the witness list is not served prior to the hearing, the court may, on request, grant a brief continuance and may make appropriate temporary orders pending the continued hearing."

16

require parties to preent their case at trial by affidavits or declarations.)" (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 5:491.1 at p. 5-193, original italics.)

In the circumstances of this case, with consequences so dire as to prohibit any contact whatsoever between Elizabeth and Jack from the age of five (when Elizabeth was first denied contact with him) to the age of eleven, we conclude due process required the trial court to hear the oral testimony of the witnesses Elizabeth sought to present. In particular, Elizabeth sought to present the testimony of Jack's teacher and principal regarding her claim Jack thrived with her involvement in his school during her visitation time; she sought to introduce the testimony of the monitor present when she said Jack showed her the red welts on his buttocks and said his dad had hit him because he (Jack) had gone in his father's bedroom; and she sought to present the testimony of the emergency room nurse Elizabeth knew and consulted before taking Jack to the UCLA center following the statements and conduct she said occurred when Jack was taking a bath. The exclusion of such testimony as irrelevant to the issues presented was erroneous and prejudicial.

In light of the parties' mutual history, the trial court should have heard evidence other than Gregory's to reach its decision on the requested order—especially in making the determination to bar Elizabeth from all further contact whatsoever with her young son. Issuance of such a draconian restraining order was not proper unless failure to issue it might jeopardize Jack's safety. (*In re C.Q.* (2013) 219 Cal.App.4th 355, 365.)

Accordingly, we reverse the order granting the restraining order and remand for further proceedings not inconsistent with this opinion. Having reached this conclusion, we need not address Elizabeth's remaining contentions on appeal.

17

*DISPOSITION*

The order is reversed and the matter is remanded for further proceedings not inconsistent with this opinion.  Elizabeth is awarded costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                          **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.