Filed 8/2/13; pub. order 9/3/13 (see end of opn.; reposted to correct document order)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re C.Q., et al., Persons Coming Under the Juvenile Court Law. | B244998 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>G.Q.,<br>        Defendant and Appellant,<br><br>A.R.,<br>        Respondent. | (Los Angeles County<br> Super. Ct. No. CK94654) |

APPEAL from an order of the Superior Court of Los Angeles County.  Sherri S. Sobel, Referee.  Affirmed in part, reversed in part and remanded with directions.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

Roni Keller, under appointment by the Court of Appeal, for Respondent A.R.

No appearance for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] the juvenile court issued a permanent restraining order requiring G.Q. (Father) to stay away from A.R. (Mother), and Father and Mother's three minor children except during monitored visitation. Father appeals from the restraining order, challenging the sufficiency of the evidence supporting the portion of the order naming the children as protected persons. He does not challenge the portions of the order requiring him to stay away from Mother and the family home where Mother and the children live.

Mother urges this court to affirm the restraining order in its entirety. Respondent Los Angeles County Department of Children and Family Services (DCFS) did not recommend the juvenile court issue the restraining order. Nor did it take a position below on Mother's request for a restraining order. DCFS has not filed a brief or otherwise made an appearance on appeal.

We reverse the portion of the restraining order naming the children as protected persons, for the reasons discussed below.

## BACKGROUND

**Detention**

In July 2012, when this family came to DCFS's attention, Father and Mother were married and living together with their three minor daughters, C.Q. (age 16), Ja.Q. (age 12) and Je.Q. (age 11), and their adult daughter, K.Q. (age 19). On July 11, 2012, Mother went into a police station and reported an incident of domestic violence perpetrated by Father on Mother earlier the same day in the family home. The incident, which we describe below, occurred in the immediate presence of Father and Mother's 12-year-old daughter Ja.Q. and while their other three daughters were in the home. Also on July 11, 2012, DCFS received and responded to a referral about this incident and interviewed Mother and her four daughters. These interviews, described below, are summarized in the July 19, 2012 detention report.

---

[1] Further statutory references are to the Welfare and Institutions Code.

When the social worker arrived at the family home on July 11, 2012, she heard people yelling inside. Father and Mother's four daughters were arguing. Mother told the social worker her daughters were upset because Mother had reported the incident of domestic violence to the police and a social worker was now visiting their home. According to Mother, her daughters told her they would not "report the domestic violence" because they did not want Father to have to leave the family home and go to jail.

Mother described the incident to the social worker as follows: While out looking for a job on July 11, 2012,[2] Mother received a telephone call from adult daughter K.Q., asking Mother to hurry home because the three minor daughters were making a mess. When Mother returned home, Father was there. Mother told their three minor daughters to clean up the home and put things back the way they were when Mother left that morning. Appearing angry, Father began arguing with Mother. He yelled: "'You can't discipline my daughters, you are stupid and you don't work, that is why you can't tell them what to do.'" Father grabbed boxes of glass figurines from a storage area in the laundry room and threw the boxes to the ground in front of Mother and their daughter Ja.Q. The other three daughters were in their bedrooms with the doors open. Mother believed they were listening to the argument. Mother asked Father why he was throwing the glass figurines she had bought. Father struck Mother in the arm with a closed fist.[3] Ja.Q., who was crying, moved in between Father and Mother and asked Father not to hit Mother. Father left the home. The daughter was not physically injured.

Mother told the social worker she and Father had separated two years before the July 11, 2012 incident because Father was in a relationship with another woman. Mother

_____

[2] In an interview with a dependency investigator prior to the issuance of DCFS's August 16, 2012 jurisdiction/disposition report, Mother stated she was out of the home on July 11, 2012 because she had gone to the doctor with her cousin.

[3] A police officer who interviewed Mother the same day as the incident reported he did not observe any injuries to Mother's arm or any other part of her body, but Mother did complain of pain in her arm.

3

and Father continued to live together despite the separation.  Father paid the rent.  Mother stated Father had been insulting her and arguing with her for the past two years.  Father told her she was "'worthless'" and "'dependent'" on him.  He also told her:  "'You don't even work so you have no say in this house and my daughters don't have to listen to you, you should be cleaning the house not my daughters!'"  According to Mother, her daughters were "siding with [Father] because he 'buys them everything and he also gives them money.'"  Mother described Father as a "a great father" to her daughters.

Mother stated the July 11, 2012 incident was the second domestic violence incident between her and Father.  The first incident occurred about a year prior when Father and Mother argued about a car Father had bought Mother.  Father wanted to take the car back.  He told Mother she should work to earn money to buy herself a car.  Mother argued the car was a gift and Father should not take back a gift.  According to Mother, Father struck her in the arm, resulting in a bruise.[4]  Mother stated her daughters witnessed this incident but urged her not to report it to the police because, if she did, "they would not see their father anymore."  Mother did not make a police report.

The social worker interviewed 11-year-old Je.Q., who was crying and appeared "to be extremely emotionally affected" by the incident.  The child acknowledged her parents argued and did not get along, but she said she did not know if her parents engaged in physical altercations.  She stated things were "'ok'" at home and she was not afraid of Father or Mother.  When asked why she was sad, the child explained she did not want her parents to separate.

The social worker also interviewed 12-year-old Ja.Q., the child Mother stated had witnessed the July 11, 2012 incident of domestic violence.  When the social worker inquired about domestic violence between Father and Mother, the child laughed and stated, "'he is my father, and I will never say anything bad about my father.'"  She denied witnessing an incident of domestic violence on July 11, 2012, stating, "'well, nothing

_____

[4] In an interview with a dependency investigator prior to the issuance of DCFS's August 16, 2012 jurisdiction/disposition report, Mother stated Father also kicked her in the leg during this first domestic violence incident.

4

happened. I did not see anything . . . .'" When the social worker asked if she had ever heard Father and Mother argue about money, the child responded, "'who told you?'" The social worker believed the child was "protecting" Father. The child stated Father "gives her money for anything she wants to buy."

Sixteen-year-old C.Q. denied knowledge of any domestic violence between Father and Mother. When the social worker asked if she ever heard Father and Mother argue, she responded, "'yes but I didn't see them hitting.'" C.Q. stated she was not afraid of Father. She also stated Father would give her money for clothing and anything else she wanted to buy. She added: "'He gives us whatever we ask for.'"

The social worker also interviewed 19-year-old K.Q. The social worker noted K.Q. did not seem surprised when the social worker explained the allegations made against Father. K.Q. asked if Mother had reported the domestic violence to DCFS, and the social worker told K.Q. the referral was confidential. K.Q. stated: "'He is my father, I would not say anything about him, my sisters deserve to see their father, and it's not fair!'" K.Q. indicated she was aware Father had thrown boxes, but she stated Father did not break anything. She also stated she did not see Father strike Mother on the arm. K.Q. acknowledged Father and Mother would argue.

Mother's 22-year-old son J.H. (Father's stepson) used to live in the family home. Mother told the social worker J.H. moved out after a June 15, 2012 altercation during which Father struck J.H. in the face in front of the other children. The social worker asked K.Q. why J.H. moved out of the family home. K.Q. responded, "'because my father did not want him here anymore, he is grown and he moved out.'" K.Q. stated she did not see Father hit J.H. In the detention report, the social worker did not report that she asked the other three daughters about the altercation between Father and J.H.[5]

---

[5] Prior to the issuance of DCFS's August 16, 2012 jurisdiction/disposition report, a dependency investigator interviewed the three minor daughters again and asked them about the June 15, 2012 altercation between Father and J.H. All three girls denied Father hit J.H.

The social worker also interviewed J.H., who stated Father "'kicked [him] out'" of the family home.[6] J.H. told the social worker, on June 15, 2012, he and Father argued "because [of] of a cell phone bill" and Father "punched him on the cheek causing him to bleed." J.H. did not hit Father back. J.H. stated, during the two years prior to the July 11, 2012 incident between Father and Mother, Father had been "constantly" arguing with Mother and calling her names. J.H. had heard Father say to Mother, "'you low life dependent on me, you don't do anything.'" When J.H. would defend Mother, Father would also call J.H. a "'low life'" and tell him, "'you don't pay rent here, you are nobody!'"

The social worker reported J.H. "stated that he feared for mother's safety because there will be no one to defend mother now. [J.H.] stated that all the children defend their father because father gives them money and buys them whatever they want. He stated that all the children do not respect mother. The children disrespect mother."

In the July 19, 2012 detention report, the social worker also described a telephone interview with a neighbor who lived "in the back house" and paid monthly rent to Mother. The neighbor stated she would often hear Father and Mother arguing. The neighbor also told the social worker Mother "has bruises all the time and mother tells her [the neighbor] that it was father who caused the bruises" According to the neighbor "the problem is that father has another woman." The neighbor described Father and Mother as "good parents."

When the social worker interviewed Father, Father denied the July 11, 2012 allegation of domestic violence and told the social worker, "'you can ask my daughters.'"[7] Describing the events of July 11, 2012, Father stated Mother was "'in the streets doing God knows what while [his] children [were] doing laundry!'" Father believed Mother should be doing the laundry because she did not work. According to

---

[6] It is not clear from the July 19, 2012 detention report whether the social worker interviewed J.H. on the same occasion she interviewed Mother and her four daughters.

[7] The detention report does not state when or where the social worker interviewed Father.

6

Father, when Mother came home she "began to scream at the children telling them to clean up because they are some "'dirty girls.'"" Father told the social worker he did not like when Mother called their daughters "'dirty.'" Father stated he told Mother "'don't tell them anything because you don't work and you should be home and not [in] the streets all day.'" Father reported that Mother "came to his face and told him to hit her." Father stated he did not hit Mother and instead "decided to throw the boxes of glass to the floor." According to Father, Mother pushed him and he left the home. Father acknowledged Ja.Q. witnessed this incident. Father stated Ja.Q. "did not have to intervene between them because [he] did not hit mother."

The social worker reported in the detention report: "Father explained that mother 'provokes me by coming and asking me to hit her[.]' Father stated that although he has never hit mother, mother continues to provoke him to scream at her and call her bad names. Father stated that he pays the rent there and all he wants is mother to do all the cleaning of the home. Father admits that he hit [J.H.] in June because [J.H.] was losing his respect."

On July 13, 2012, Mother applied for and the Los Angeles Superior Court issued a temporary restraining order requiring Father to stay away from Mother and their three minor daughters, and denying Father visitation with the minor daughters. The order was set to expire on the next hearing date, August 7, 2012.

On July 19, 2012, DCFS filed a dependency petition under section 300, subdivisions (a) and (b), alleging (1) Father and Mother's history of domestic violence in the three minor daughters' presence, including the July 11, 2012 incident, and (2) Father's violent altercation with Mother's adult son J.H. on June 15, 2012. At the hearing on July 19, 2012, the juvenile court ordered Father and Mother's three minor daughters detained and released to Mother.[8] The court also issued a temporary restraining order listing Mother and the three minor daughters as protected persons. The

---

[8] Father previously had informed DCFS he consented to detention and release to Mother.

court granted Father monitored visitation with the minor daughters to commence after expiration of the superior court temporary restraining order.[9]

**Jurisdiction/Disposition**

On August 8, 2012, the minor daughters had their first visit with Father. In the August 16, 2012 jurisdiction/disposition report, DCFS stated the children enjoyed themselves during the visit.

At the September 25, 2012 adjudication and disposition hearing, the juvenile court adopted the parties' mediation agreement, dated September 7, 2012. As part of the agreement, the parties submitted on counts b-1 and b-2 in the petition as amended. Count b-1 provides: "The Children C[.], Ja[.] and [Je. Q.'s] mother, A[.]R[.] and father, G[.]Q[.] have a history of engaging in violent altercations in the presence of the children including on 7/11/12 when the parents engaged in a violent verbal and physical altercation including but not limited to father throwing boxes in the presence of Ja[.] who became frightened and attempted to intervene. Father's aggressive conduct against the mother and mother's lack of protection places the children at risk of harm." Count b-2 provides: "On 6/15/12 the children C[.], Ja[.] and Je[.] Q[.]'s father, G[.]Q[.] and the children's adult sibling J[.]H[.] engaged in a violent altercation in the children's presence. Father's aggressive conduct against the adult sibling in the presence of the children places the children at risk of harm." The juvenile court sustained counts b-1 and b-2 and dismissed counts a-1 and a-2.

The juvenile court declared the children dependents of the court, ordered them removed from Father's physical custody, and placed in the home of Mother with a plan of family maintenance services. In accordance with the mediation agreement, the court granted Father monitored visitation with the children to occur a minimum of two times

---

[9] Minor daughters' counsel informed the juvenile court the children were unhappy when they learned their Mother had listed them as protected persons in her superior court application for a temporary restraining order. In the detention report, the social worker noted Father and Mother's four daughters were "so angry with [Mother] for disclosing the abuse they [were] no longer speaking to her."

per week, two hours per visit, so long as no criminal court restraining order prohibited such visits. The court granted DCFS discretion to liberalize the frequency and duration of Father's visits, but ordered that DCFS could not lift the monitor requirement without court approval. Also in accordance with the mediation agreement, the court ordered Father to participate in parenting, individual counseling and a 52-week domestic violence program.

The court commented: "I am keeping the case open. This is a long history and I'm not closing this out with a family law order until I am sure Mother can protect the children."

**Permanent Restraining Order**

At the September 25, 2012 hearing, after the juvenile court resolved the jurisdictional and dispositional issues, Mother requested a permanent restraining order against Father. Father objected to the restraining order, arguing there was no evidence supporting the inclusion of the children as protected persons because he did not place the children at risk. The children's counsel informed the court the children had "always wanted visits with their father."

The juvenile court overruled Father's objection and issued a permanent restraining order requiring Father to stay away from Mother, the three minor children (except during monitored visitation), the children's school or child care, and the home where Mother and the children live. The court commented: "I'm absolutely issuing the restraining order, other than the monitored visits for everybody. He got into a fistfight with one of their siblings. They may like him but the fact of the matter is this is an ongoing case of domestic violence. The restraining order will be issued for three years to 9-25-15. [¶] . . . [¶] I have no problem six months from now, if it turns out that there is no problem here, modifying this. But, for right now, if we're not modifying it, I don't want it to have to be heard again. So it is issued."

## DISCUSSION

Father contends the evidence was insufficient and there was no compelling reason to support the issuance of a restraining order naming the three minor children as protected

9

persons. He does not challenge the portions of the restraining order naming Mother as a protected person and requiring him to stay away from the family home where Mother and the children live.[10]

Under section 213.5, subdivision (a), the juvenile court may issue an order "enjoining any person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, . . . destroying the personal property, contacting, . . . or disturbing the peace of the child . . . ." This subdivision also permits the court to issue orders including the child's parent as a person protected from the behaviors listed above, and excluding the restrained person from the child's home.

Issuance of a restraining order under section 213.5 does not require "evidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered the child." (*In re B.S.* (2009) 172 Cal.App.4th 183, 193.) Nor does it require evidence of a reasonable apprehension of future abuse. (*Ibid.*) In *In re B.S.*, *supra*, 172 Cal.App.4th at page 194, the Court of Appeal concluded section 213.5 is analogous "to Family Code section 6340, which permits the issuance of a protective order under the Domestic Violence Prevention Act . . . if 'failure to make [the order] may jeopardize the safety of the petitioner . . . .' [Citations.]"

In reviewing the restraining order, "we view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination. If there is substantial evidence supporting the order, the court's issuance of the restraining order may not be disturbed." (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210-211; *In re B.S.*, *supra*, 172 Cal.App.4th at p. 193.)

As Father points out, in *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512, the Court of Appeal applied both the substantial evidence and abuse of discretion standards

---

**10** Mother devotes a section of her respondent's brief to her argument she made the requisite showing under section 213.5, subdivision (e)(2), supporting an order excluding Father from the family home. Mother incorrectly cites this provision as subdivision (c)(2). We need not address Mother's analysis on this point because Father does not challenge the portion of the restraining order requiring him to stay away from the family home.

in deciding whether the juvenile court erred in issuing a permanent restraining order under section 213.5 barring a grandmother from contact with her grandchildren or their foster parents. (*Id.* ["[T]here was sufficient evidence to support a conclusion that appellant had been 'stalking' the minors and the foster parents. There was no abuse of discretion by the juvenile court in imposing a restraining order pursuant to section 213.5"].)

In this case, in applying either the substantial evidence standard or a combined substantial evidence and abuse of discretion standard, we find the juvenile court erred in listing Father and Mother's three minor daughters as protected persons in the restraining order. There is no evidence indicating the children's safety might be in jeopardy absent their inclusion in the restraining order. (See *In re B.S.*, *supra*, 172 Cal.App.4th at p. 194.) The portions of the restraining order Father does not challenge require Father to stay away from Mother and the family home where Mother and the children live. Father has monitored visitation with the children and Mother is not permitted to monitor those visits. The children have stated they want visits with their father and are not afraid of him. There have been no reports that Father has engaged in any violent or otherwise inappropriate conduct since the July 11, 2012 incident.

This case is not analogous to *In re Cassandra B.*, *supra*, 125 Cal.App.4th at page 212, where the Court of Appeal affirmed the juvenile court's issuance of a permanent restraining order based on substantial evidence the mother, who had been granted monitored visitation, "was 'molesting'" or annoying her nine-year-old daughter by "attempting to gain entry to the home of Cassandra's [the daughter] caregivers without their knowledge, appearing at Cassandra's school and then following behind the caregiver's car after Cassandra was picked up from school, together with her threats to remove Cassandra from her caregivers' home." The child in that case told the social worker she was afraid her mother was going to kidnap her. (*Id.* at p. 206.) "[T]here was ample evidence" supporting the issuance of a permanent restraining order which included the daughter as a protected person. (*Id.* at p. 212.)

11

Similarly, in *In re Brittany K.*, *supra*, 127 Cal.App.4th at page 1512, the Court of Appeal affirmed the juvenile court's issuance of a permanent restraining order requiring a grandmother to stay away from her grandchildren based on substantial evidence the grandmother, who was seeking custody of her grandchildren, was "'molesting'" or "'stalking'" the children. The appellate court stated: "[T]he record shows appellant [the grandmother] concealed herself at a scheduled visitation between the minors and their birthmother so as to obtain unauthorized access to them; surreptitiously searched out and located the confidential location of the foster residence, in violation of their intended privacy; hired a private detective to spy on the minors' comings and goings at their foster home; and showed up unannounced at each of the minors' schools, where she proceeded to make defamatory accusations about the foster parents to school authorities and attempted to make unauthorized contact with the minors." (*Ibid*.)

Mother argues this case is analogous to *In re B.S.*, *supra*, 172 Cal.App.4th 183. In that case, the father and the mother "'stood over'" their infant son as the father battered the mother. (*Id*. at p. 186.) As the physical altercation continued, the father "'threw [the mother] down on top of'" the infant and then "fell on top of both the mother and [the infant]." (*Ibid*.) Before fleeing the home, the father threatened to come back and shoot the mother and her friend who had intervened during the altercation. After finding jurisdiction, the juvenile court issued a permanent restraining order prohibiting the father from contacting his infant son except for court-ordered visitation. (*Id*. at p. 188.) The Court of Appeal affirmed. (*Id*. at p. 195.)

This case is distinguishable from *In re B.S.* Here, when Father and Mother's 12-year-old daughter stepped in between Father and Mother on July 11, 2012, Father walked away. In *In re B.S.*, *supra*, 172 Cal.App.4th at page 194, the appellate court found the father had intentionally thrown the mother on top of their infant son. Accordingly, there was substantial evidence that failure to include the infant as a protected person under the restraining order might jeopardize his physical safety. (*Ibid*.)

The fact Father submitted on the amended allegations in the dependency petition does not mean issuance of the restraining order was proper as Mother appears to argue.

12

Issuance of the restraining order was not proper unless failure to issue the order might jeopardize the safety of the children.  (*In re B.S.*, *supra*, 172 Cal.App.4th at p. 194.)  As discussed above, the record does not include sufficient evidence supporting the inclusion of the three minor daughters as protected persons under the restraining order.

## DISPOSITION

The juvenile court is ordered to modify the September 25, 2012 restraining order by deleting the names of the three children [C.Q., Ja.Q. and Je.Q.] from the list of protected persons.  In all other respects the restraining order is affirmed.


                                                            CHANEY, J.

We concur:


         ROTHSCHILD, Acting P. J.


         JOHNSON, J.


13

Filed 9/3/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re C.Q., et al., Persons Coming Under the Juvenile Court Law. | B244998 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>G.Q.,<br>      Defendant and Appellant,<br><br>A.R.,<br>      Respondent. | (Los Angeles County<br> Super. Ct. No. CK94654)<br><br>ORDER CERTIFYING OPINION<br>     FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:\*

The opinion filed in the above-entitled matter filed on August 2, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____

\*    CHANEY, J.       ROTHSCHILD, Acting P. J.      JOHNSON, J.