Filed 3/17/16  In re Anthony C. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re ANTHONY C., a Person Coming Under the Juvenile Court Law. | B264318 (Los Angeles County Super. Ct. No. DK08582) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANTHONY C., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica Paulson-Duffy, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Anthony C. (father) appeals from the juvenile court order finding jurisdiction over his son Anthony C. (Anthony) and from a permanent restraining order naming Anthony as a protected person. We affirm.

## BACKGROUND

On December 5, 2014, the Los Angeles County Department of Child and Family Services (DCFS) filed a petition under Welfare and Institutions Code section 300, subdivisions (a), (b), and (j)[1] alleging that that father had physically abused J.C. (J.C.), the eight-year-old son of A.H. (mother) from another relationship, and that mother and father had engaged in violent altercations in the children's presence. As a result of the abuse of J.C., mother's 10-year-old son Joshua C. (Joshua) (also from the other relationship) and father and mother's seven-month-old son Anthony were at risk of abuse. The petition also alleged under subdivision (b) that father had a history of substance abuse and currently abused marijuana, including while the children were under his care and supervision, and mother and father placed the three children in danger by possessing a handgun, rifle, and multiple magazines and ammunition in the home within the children's access. Mother and the children were living at a confidential location.

DCFS had received a referral in November 2014, alleging that in May 2014 father had physically abused mother by slapping her and pulling her hair, and he had also physically abused J.C. On May 22, 2014, mother had told the police that while she was sitting on the sofa holding Anthony (who was less than a month old), she and father argued about his discipline of J.C. and Jonathan. Both boys were present and saw the abuse. Father stood over mother and told her to "'mind her business.'" He grabbed her by the hair with both hands, shook her head back and forth four or five times, and then let go and covered her mouth with his hand. When mother tugged on his shirt, he slapped her face. She tried to open the front door to let her children leave, but father approached her and told her nobody would be leaving. Frightened, mother slapped father in the face,

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

and he then grabbed her hair again and pulled it. He left the apartment to smoke a cigarette and mother called the police from a neighbor's residence.

Mother had redness and minor bruises on her face. The police arrested father and confiscated two guns, a handgun, and ammunition from the bedroom, in a closet and next to a dresser. The district attorney did not file criminal charges due to a lack of evidence.

On November 20, 2014, mother told DCFS that most of the abuse was verbal, when father would demean mother for being undocumented. Because the physical abuse in May was an isolated incident and father and mother wanted to work on their relationship, DCFS had given the family voluntary services and had closed the May referral.

Mother and father were not married and had lived together since early 2014. Mother told the social worker who interviewed her on November 21, 2014, that after the referral in May, father did not cooperate with the voluntary services, which included an in-home counselor named Milena. Father continued to call mother names (translated from Spanish as "'[d]umb ass, fucking bitch, snake, and opportunistic dummy'") and called her children "'[m]orons.'" After mother told Milena she wanted to leave the relationship, Milena spoke with father and for three weeks he did not abuse her verbally. After Milena's last day, however, father told mother's sons, ""'If you don't eat your food, the police said I can hit you,'"" and called mother an "'opportunistic fucking bitch'" when she complained that he woke Anthony up. Mother thought Father was going to hit her again. On October 3, 2014, when mother was unable to pay her half of the rent and food, he started to call her names and told her to get her things and leave, adding: ""'If you are going to take the baby and we go to court, if I don't get 50% custody, I'm going to kill you and the boys.'"" Mother was in shock and began to sleep in the living room, because father had a rifle in the house without her permission, and kept bullets in the closet.

Mother eventually moved back into the bedroom, but from her domestic violence classes she knew she "'had to plan my departure with utmost discretion.'" Her therapists helped her make a plan while she tried to keep the peace at home. Father would come

3

home high on marijuana and go right to bed (mother preferred it when father was high because he was calmer). Mother left on November 10, while father was at work. Father had not hit her or the children since the May investigation, and although he yelled at Anthony, he was otherwise a loving father to him. Mother wanted a restraining order but was "'afraid to go to court and see [father].'"

J.C. told the social worker that he felt safe with mother but not with father, who treated them badly and yelled at the baby too (although the baby couldn't understand him) and when he got mad would hit mother or go outside to smoke. Father had not hit J.C. for a while, but he didn't want to live with father anymore.

Joshua told the social worker that he didn't feel safe with father because he was always "'fighting with my mother with words,'" called her names Joshua didn't understand, screamed at them a lot, and kept a rifle under the bed in an unlocked box (he did not know if it was loaded). Joshua had seen father hit mother and pull her hair and father once hit J.C.'s bare bottom with a belt, but father did not hit Joshua. Joshua thought that father would hit mother and the boys if they went back, and "'could kill us.'" Father still had the rifle, and mother had told Joshua that father said he would kill them if father could not stay with Anthony.

Milena stated that father had cooperated with the home counseling and although mother at first had said she wanted to leave, she subsequently decided to stay. Father had anger issues and easily became frustrated and upset. The other clients in his parenting class felt threatened by him and he had been asked not to come back. Father had become angry when he learned he could not get his certificate until he completed 12 classes. He raised his voice at the director, who thought he would get violent, and he made a hand gesture toward her as if he was pointing a gun.

Father, who was agitated and easily frustrated, admitted to the social worker that he called mother names, but "'she does things too'" and would not let him discipline the children. He denied he had used a gun gesture at the director. He suspected Anthony was not his child, and thought mother had been using him all along. "'Do you think a man wants to take care of another mother-fucker's children?'" Father accused mother of

4

taking his new rifle with her when she left, and denied ever saying he would kill her or the kids. Father had a marijuana card. He begged for visitation with Anthony: "'I still love him even though he may not be mine.'"

DCFS concluded that there was a high risk for future abuse and neglect for all three children, and recommended Anthony be detained from father. DCFS also recommended no visitation for father until mother had a restraining order.

On December 5, 2014, the juvenile court ordered a paternity test for father (later finding that he was Anthony's biological father) and removed Anthony from father. The court issued a temporary restraining order prohibiting father from contact with mother and all three children, and gave father three-hour monitored visits with Anthony at least twice a week.

The jurisdiction/disposition report filed January 9, 2015 included additional interviews. J.C. explained they moved "'[b]ecause Tony hit my mom. She called the police and we had to go to court.'" J.C. did not see the violence but heard father call mother names in Spanish, and was scared when father was mean. "'My mom told me that he was going to kill us.'" J.C. answered, "'[y]eah, think yeah,'" when asked if father hit him, explaining that he did not want to eat a burger and mother told him to run to the bedroom. J.C. knew father had two guns which the police took, but father kept a rifle after he was told not to have any other guns.

Joshua said he had to be "'super good'" for father, who had made him stand in the corner for about an hour. Father hit J.C. with a belt when J.C. did not want to eat a hamburger, telling J.C. to put his pants down and then when J.C. refused, hitting him once hard over his clothes. Father had pulled on Joshua's and J.C.'s ears. When mother became upset, father covered her mouth, pulled her hair and slapped her while she was holding Anthony. Joshua was "'frozen with fear.'" Father later threatened mother "'if out of all this, if he does not get to see the baby, he is gonna kill us.'" They left a few days later. Father kept a rifle in the closet after the police took his guns away. Joshua was afraid of father, and if mother took the rifle it was to protect them.

5

Mother said father called her every word in the dictionary throughout her pregnancy with Anthony, and would punch the walls.  She confirmed that the first time he was physically violent with the children, father hit J.C. with a belt and she then refused to speak to him for three days.  The day her water broke she told father she was upset and he apologized.  In May 2014, father had pulled J.C.'s ear.  When mother tried to defend J.C., father covered her mouth, grabbed her by her hair, and slapped her while she was on the sofa holding Anthony.  She didn't know what to do so she slapped him back.  In October, when she did not have the rent money, he told her to leave.  When she said she would leave, father said "'he would take me to court for custody and that if he did not have a good outcome, that he would kill me and my children.'"  Scared, she began to plan how to get out of the situation.  Father told her to tell the counselor that everything was okay, but one day she "'spill[ed] her guts'" to Milena.  On the day Milena left, "'I don't think she was in the car yet, when he started to make threats.'"  After help from her case manager mother moved out on November 10.  She denied taking the rifle.

Father said mother and he had problems because she did not discipline the children, and he thought it wasn't fair that he paid the bills but was not allowed to discipline them.  On May 24 after J.C. and Joshua were horsing around in the bathroom and mother was breastfeeding Anthony, father grabbed J.C.'s ear.  When mother saw his ear was red and father told her what happened, she slapped him and he slapped her back.  Mother told him to leave and was "'on crazy mode,'" ripping his shirt.  He grabbed mother by the hair to get her off him.  Mother was just crying wolf, and had taken his rifle.  He did not think what he did was wrong, because they both did it.  He denied using a gun gesture or threatening the counseling staff.  Father began to cry because he was not allowed to see J.C. and Joshua.  He had tried to get his guns back from the police but could not because of the restraining order, and after 60 days he lost them.

Mother said father smoked marijuana daily but only outside the house, and when he was under the influence there was less fighting.  Father said he used marijuana two to seven times a week for his migraines.

**Jurisdiction/disposition hearing**

At the hearing on April 21, 2015, the social worker who investigated the November 2014 referral testified that the verbal abuse, corroborated by the children, began during the investigation of the domestic violence in May 2014. Father had shown her an empty rifle case and said the gun had been stolen. Mother told the social worker that father threatened to kill her and the boys.

The court sustained the allegations under section 300, subdivisions (b)(1) and (j) regarding father's physical abuse of J.C. and physical and verbal abuse against mother in the children's presence, and dismissed the other allegations.[2] The court stated this was a casebook, although subtle, case of domestic violence, with father attempting to control mother by physical and verbal abuse. The children confirmed the emotional and physical violence and showed signs of internalizing it. The court declared all the children dependents, gave mother physical custody, and placed mother and the children under DCFS supervision, with mother to enroll in a program for victims. The court ordered DCFS to ensure that father received monitored visitation with Anthony for three hours twice a week with discretion to liberalize, and ordered father to complete a 52-week domestic violence program and individual counseling.

Mother's counsel asked that the temporary restraining order be made permanent. Given father's verbal abuse and threats even after DCFS was involved mother feared further domestic violence. Father's counsel objected to a restraining order (especially one naming Anthony), as father had not threatened to kill mother and she was living at a confidential address so that there was no contact between them. The court granted the request for a permanent restraining order under section 213.5, to remain in effect until April 21, 2018, with monitored visitation for father with Anthony twice a week for three hours. The restraining order included Anthony, given his age and because mother was

---

[2] In the sustained allegations under section 300, subdivision (b), the court struck references to mother's failure to protect and a reference to her slapping father.

7

the primary caregiver, and because father "does not seem to believe he has a [domestic violence] issue."

## DISCUSSION

Father argues the court's finding of jurisdiction over Anthony was not supported by sufficient evidence that Anthony was at a substantial risk of harm at the time of the hearing. We will affirm if substantial evidence, contradicted or uncontradicted, supports the juvenile court's finding of jurisdiction, resolving any evidentiary disputes in favor of the court's decision and drawing all reasonable inferences to support its decision. We cannot reweigh the evidence and we leave to the trial court credibility determinations and issues of fact. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We "'can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*Ibid.*)

Jurisdiction under section 300, subdivision (b)(1) requires proof that a child suffered, or is at substantial risk of suffering "serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717.) Spousal violence endangers children, who if they are present when it occurs, could be hit accidentally, and who also suffer from observing it. (*In re R.C.* (2012) 210 Cal.App.4th 930, 941–942.)

The record contained evidence that in May 2014, after father and mother had lived together for less than six months, father pulled J.C. and Jonathan's ears and mother remonstrated with him. Mother was sitting on the couch breastfeeding Anthony, who was not yet a month old. Father grabbed mother by the hair, shook her back and forth four or five times, covered her mouth with his hand, and slapped her face. When she

tried to open the front door so the two boys could leave, father grabbed her hair again and pulled it. All this occurred with Anthony in mother's arms. After May 2014, father continued to abuse mother verbally. In October 2014, he told her that if she left and took Anthony, if he did not get equal custody, he would kill her, J.C. and Jonathan. Mother left a month later with Anthony, J.C., and Jonathan.

The evidence supports a finding that father's domestic violence against mother put Anthony at substantial risk of suffering physical harm. Anthony was under a month old while he was in mother's arms during an extended instance of father's physical abuse in May 2014. Father continued to abuse mother verbally, and she left for a confidential location a month after his October 2014 threat to kill mother, J.C., and Jonathan if he did not get equal custody of Anthony. This is was evidence that the domestic abuse was ongoing and likely to continue. The hearing took place less than a year after the incident of physical abuse and six months after father's threat to kill mother and her children.

Father relies on *In re Daisy H.*, *supra*, 192 Cal.App.4th 713, but in that case the father had never intentionally harmed any of the children and had not made threats to hurt them; his sole act of physical violence against mother was seven years before the petition was filed; and there was no evidence that any of the children were physically exposed to the violence. (*Id.* at pp. 716–717; see *In re M.W.* (2015) 238 Cal.App.4th 1444 [single domestic violence incident seven years ago].) This case presents "materially more aggravated facts." (*In re R.C.*, *supra*, 210 Cal.App.4th at p. 944.) The infant Anthony was not only present during the violence but was in mother's arms while father battered her, and father later threatened to kill mother and the other two children, who had seen father physically abuse mother, knew of the threat to kill them and mother, and were afraid of father. Substantial evidence supported the court's finding of jurisdiction over Anthony.

Father also argues there was insufficient evidence to support the inclusion of Anthony as a protected person in the permanent restraining order. We review the trial court's issuance of a restraining order for substantial evidence (*In re B.S.* (2009) 172 Cal.App.4th 183, 193), viewing the evidence in the light most favorable to the respondent

9

(DCFS). (*In re C.Q.* (2013) 219 Cal.App.4th 355, 364.) "Issuance of a restraining order under section 213.5 does not require 'evidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered the child.' [Citation.] Nor does it require evidence of a reasonable apprehension of future abuse. [Citation.] . . . [S]ection 213.5 is analogous 'to Family Code section 6340, which permits the issuance of a protective order under the Domestic Violence Prevention Act . . . if "failure to make the order may jeopardize the safety of the petitioner . . . ." [Citations.]'" (*Id.* at pp. 363–364.) The court may review and consider the contents of the DCFS file. (Cal. Rules of Court, rule 5.630(d)(1).) Monitored visitation of a child is not incompatible with a restraining order. (*In re N.L.* (2015) 236 Cal.App.4th 1460, 1466.)

Father cites *In re C.Q.*, *supra*, 219 Cal.App.4th 355 "as a case with similar facts" in which this court concluded there was insufficient evidence to support naming three children as protected persons. Those children were between 11 and 16 years old. There was one incidence of domestic violence in which father and mother were arguing, father struck mother in the arm with a closed fist, and their 12-year-old daughter moved between them and asked father not to hit mother, whereupon he left. The 12 year old was not injured. None of the children was afraid of father or wanted him to leave. (*Id.* at pp. 357–359.) We concluded that given those facts, there was no evidence that their safety might be in jeopardy, and we noted there were no reports that father had engaged in an violent or inappropriate conduct since the single incident. (*Id.* at p. 364.) The facts in evidence in this case, however, are quite different. Viewing the evidence in favor of DCFS, father was verbally abusive and punched the walls throughout mother's pregnancy with Anthony. In May 2014, less than a year before the jurisdiction hearing and when Anthony was less than a month old, father argued with mother, standing over her while she was on the sofa breastfeeding Anthony. Mother's other two sons, eight and 10 years old, were in the room. Father grabbed mother's hair with both hands, shook her head back and forth four or five times, let go to cover her mouth with his hand, and then slapped her face. When mother tried to open the door to let the boys leave, father told her nobody was leaving; she slapped father and he pulled her hair again. Both boys were

10

afraid of father, who physically abused the younger boy. This is sufficient evidence that Anthony's safety was in jeopardy. Further, father continued to behave in a threatening manner after the incident. DCFS provided services, but father began to verbally abuse mother the minute in-home counseling ended. In October 2014, Father threatened to kill mother and the boys if she took father to court and he did not get 50 percent custody of Anthony. The boys confirmed father's physical and verbal abuse and the threat to kill them and mother. The trial court was entitled to draw the inference that Anthony's safety was in jeopardy, especially given his tender age.

*In re B.S.*, *supra*, 172 Cal.App.4th 183 involved facts more similar to those in this case. B.S.'s father pushed and swung at mother while they stood over seven-month-old B.S.; father threw her down on top of B.S.; and father threatened to come back and shoot mother and her friend who intervened. (*Id.* at p. 186.) The court of appeal concluded: "This demonstrated, at a minimum, willful disregard for the safety of B.S." (*Id.* at p. 194.) The record here contained ample evidence that demonstrated, at a minimum, willful disregard for Anthony's safety. Further, father's "evident lack of impulse control" (*ibid.*) was clear from the record, and certainly he subsequently engaged in inappropriate conduct by threatening to kill mother and the boys if a custody decision did not give him equal time with Anthony. The court could reasonably infer a threat to Anthony's safety. "Even assuming an opposite inference might be equally reasonable, we are not authorized to second-guess the juvenile court on this point." (*Ibid.*)

Sufficient evidence supported the issuance of a restraining order including Anthony as a protected person.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

12