Filed 7/14/21  In re J.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.B., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D078241 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ03281F) |
| v. | |
| M.S. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed in part, reversed in part.

Annie Greenleaf, under appointment by the Court of Appeal, for Defendant and Appellant M.S.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant C.B.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent

I

INTRODUCTION

This is the second appeal arising from dependency proceedings for minor J.B. (Minor). In the case of *In re S.S.* (Apr. 23, 2021, D077787 [nonpub. opn.]), we affirmed an order terminating the parental rights of C.B. (Father) and M.S. (Mother) and approving a plan of adoption for Minor. Thereafter, the juvenile court denied a request by Minor's caregivers for a permanent restraining order against both Father and Mother because the court determined the caregivers had not shown an immediate threat or recent pattern of conduct to justify a restraining order. Nevertheless, the court ordered there be no contact between Minor and the biological parents. Father and Mother appeal the order contending the court violated their civil liberties by issuing an indefinite no-contact order with the minor without statutory authority or due process. We agree and, therefore, reverse the no-contact portion of the order. We affirm the order insofar as it denied the caregivers' request for a permanent restraining order.

II

BACKGROUND[1]

A.    *Dependency Proceeding*

Minor and Mother's older children were removed from Mother and Father shortly after Minor was born in 2018 based on concerns of substance abuse and mental health issues for both parents, a relationship between the parents marked by domestic violence, and concerns about a gambling addiction by Father, all of which impacted the parents' ability to provide safe

[1]    Because a detailed factual background is not pertinent to the issues in this appeal, we provide only a general description of the dependency proceedings as drawn from our prior opinion, *In re S.S.* (Apr. 23, 2021, D077787 [nonpub. opn.]).

2

and stable care for Minor.[2] (*In re S.S.*, *supra*, D077787.)  Father and Mother did not meet their reunification service goals over an extended period.  Both parents denied or minimized the issues that brought Minor into dependency. (*In re S.S.*, *supra*, D077787.)

In January 2020, the court found by clear and convincing evidence that the return of Minor to the parents' custody would create a substantial risk of detriment to Minor's physical or emotional well-being.  The court further concluded that even though the parents had made some progress with their case plan, there was not a substantial probability Minor could be returned to the physical custody of the parents within 18 months (which had already expired).  The court terminated reunification services for Mother and Father and set a hearing for a permanent plan for Minor.  (*In re S.S.*, *supra*, D077787.)  In August 2020, the court terminated Mother's and Father's parental rights and found adoption was in the best interest of Minor and the preferred permanent plan.  (*In re S.S.*, *supra*, D077787.)

B.     *Requests for Restraining Orders*

On August 7, 2020, the same day of the contested section 366.26 hearing, Minor's caregivers filed requests for restraining orders against Father and Mother asking that they be ordered to stay 100 yards away from Minor, caregivers, and their nanny.  In a statement supporting the requests, the caregivers said both parents had restraining orders placed against them in the past, that Father and Mother had sent messages through third parties demanding the return of Minor, and Father sent text messages stating he intended to take Minor and the other children out of state.  The caregivers

---

[2]     Mother's older children were previously removed in 2013 in another county due to domestic violence between Mother and her former husband. Mother reunified with the children in 2015.  (*In re S.S.*, *supra*, D077787.)

expressed concern about the parents' history of violence and that the parents would harm the caregivers, forcibly take the child from their care, and leave the state.

Father's appointed counsel opposed the request saying the court did not have jurisdiction over Father after terminating his parental rights. Counsel expressed concern that Father would not have representation or an opportunity to make changes to the order later in the juvenile court, which would be a violation of due process. Counsel indicated the caregivers could seek a civil restraining order. Mother's counsel joined in these arguments. Retained counsel for the caregivers expressed concern that a civil court could not include Minor in a restraining order because the juvenile court had jurisdiction over the child as a dependent. Minor's counsel stated he was not opposed to a restraining order and would submit to the court's determination of whether such an order was appropriate. The court set the matter for a special hearing.

At the next hearing on August 12, 2020, the court issued a temporary restraining order. Minor's counsel supported the issuance of a temporary restraining order, but indicated they would evaluate whether to support a permanent restraining order or allow peaceful contact with the child. Father left the virtual proceeding before the court signed the temporary restraining order, but he was represented by appointed counsel.

At a hearing on September 4, 2020, retained counsel for the caregivers stated they were not successful in serving the restraining order. The court stated the biological parents were deemed served because they were present telephonically. Father said he had not been given notice and wanted a continuance. The court agreed to continue the hearing and asked if Father intended to hire a lawyer. Father said he would "possibly" hire a lawyer. He

4

opposed the permanent restraining order and indicated he would like to call witnesses. The court advised him to hire a lawyer as soon as possible.

Father and Mother appeared by telephone at the next hearing on September 24, 2020. Father said he "didn't really receive paperwork to notice -- to see what they are actually accusing me of . . . ." The court offered to send the moving papers to him by e-mail and to grant a continuance. However, Father said, "I don't really see a reason to continue it because there doesn't seem like there is any type of evidence to show that I've done anything, because I haven't done anything." The court told Father that he would hear testimonial evidence in support of the request for the restraining order and Father would be able to ask the witnesses questions. After Father agreed to the procedure, the court said, "So then, I believe, we can go forward, there is no objection."

Caregiver A.B. testified in support of the request by her and her husband for a restraining order against Father and Mother. She stated Father had stalked people who had active restraining orders against him and he has acted erratically and out of control around her in the past. She said Father claimed the caregivers "paid off judges and CPS . . . to steal his child."

A.B. said Father and Mother had stalked the caregivers "a few times in December of 2019" and in October of 2019 when they followed the caregivers and Minor on Halloween. They went trick-or-treating at local businesses on a main street and went to dinner with the grandparents. Father stood on the sidewalk near the restaurant and stared at them.

The caregivers saw a vehicle they believed Father owned driving past their house "frequently since the last .26 hearing." Two weeks before the September 24, 2020 hearing, someone fitting Father's description was seen

driving toward the caregivers' home. A.B. said there is no reason to come to the neighborhood other than to visit someone's home.

The caregivers were concerned about Father becoming obsessive and flying off the handle. A.B. said Father used to tell them he was going to find his ex-wife and do things to violate the restraining order she had against him.

A.B. also mentioned an altercation in which Father punched his own father (A.B.'s father-in-law and Minor's grandfather) during an argument about Minor and the other children being placed in the grandparents' home. A.B. said the grandfather sustained a black eye and a broken tooth.[3] Minor was moved from the grandparents' home after the altercation and was placed in nine homes within a year. The caregivers did not want the parents to have access to Minor such that they could jeopardize the child's placement.

A.B. also expressed concern about a statement Father made to his mother about getting the kids and leaving the state. Father sent a text message to the grandmother within the first six months that Minor was placed with the caregivers saying that he planned to get all the kids and get out of state. There were no similar threats of kidnapping in the six months before the hearing.

The caregivers did not receive direct threats from Father, but he posted statements on social media about not messing with him or his family. Father stopped a family friend and said the caregivers stole his child and asked the friend to tell the caregivers to give the child back.

---

[3]   In May 2019, a verbal argument between Father, Mother and Father's parents escalated into a physical altercation. The sheriff's deputy who responded to the call described the incident as "mutual combat" between the four adults. Minor and the other children were removed from placement with Father's parents after this incident. (*In re S.S.*, *supra*, D077787.)

A.B. said Mother was also involved in the altercation with Minor's grandparents and was violent with the grandmother during that incident. She also described a situation when Minor became upset during a visit and wanted to go home. Mother became angry and "got in the face" of the worker who tried to console the child. Mother was upset because Minor called the caregivers dad and mom. The caregivers were called to console the child and help Minor return to the visit. However, the visitation supervisor did not allow them to go into the building because he was concerned Mother would cause a confrontation.

A.B. expressed concern that Mother would act unpredictably if she saw the child or the child's nanny in the community. They wanted to make sure Minor was safe from any acts of violence or a potential kidnapping.

On Father's cross-examination, A.B. agreed she did not witness the altercation with the grandparents and only heard the grandparents' account of the incident. A.B. agreed she had not seen Mother or Father drive past their house in the eight months prior to the hearing, although she had seen a truck in recent weeks that she believed was owned by Father. A.B. also admitted she had not received any phone calls or threats from Mother or Father and neither parent had shown any violent behavior toward A.B. A.B. admitted neither Father nor Mother ever said anything directly to her to put her in fear for herself or her family. In the prior six months, neither Father nor Mother did anything to cause A.B. to fear for herself.

A.B.'s husband, caregiver Ja.B., testified that they wanted restraining orders to make sure Minor is safe going forward and to "prevent anything that would ever happen or occur to harm him or anybody in [their] family." Based on Father's social media post, the caregivers felt he looked at them as the problem or the enemy and Ja.B. did not know what to expect in the

future. Ja.B. did not have confrontations with the Father in the prior six months other than asking him to put a mask on for a visit with the child. At one point Father told Ja.B. to stay away from the visit when the Minor appeared unsure, but Ja.B. was not offended by that statement.

A truck that looked like Father's truck drove by their home and parked 150 feet past their home. They were concerned about Minor being out in the community with the nanny. Ja.B. said it was an unpredictable situation and they did not want any altercations or negative interactions around the child.

A social worker testified the caregivers expressed fear of the biological parents based on Father's relationship history and their belief he was driving past their home. They were concerned they could be attacked like the grandparents were attacked. On Father's cross-examination, the social worker admitted she was not the social worker at the time of the altercation with the grandparents and had not seen a recording of the incident.

The social worker witnessed an incident at a visitation when Mother became agitated. However, she could not say that a physical altercation would have occurred if A.B. had entered the visitation room. The social worker could not answer yes or no to whether a restraining order was a good idea to protect Minor in his placement.

Father testified he sold his truck. He also testified he worked a few houses down from the caregivers' home in January of 2020, but had not worked in the neighborhood since then.

Mother testified the restraining order was not merited because she has accepted the fact that her children are not coming home. She stated she is devastated and emotionally distraught, but is seeking healing and going through a grieving process. She believes she is at the acceptance phase of that process and has no ill will toward the caregivers. She wished them the

8

best. She stated she wanted to live in peace and was moving on with her life. She said she did not want contact with the family.

Minor's counsel asked no questions and submitted on the evidence presented.

The court reviewed the civil harassment statute, Code of Civil Procedure section 527.6 and the Family Code. The court denied the request for a permanent restraining order, stating there was no immediate threat or recent pattern of conduct.

The court, however, ordered "no contact" between Minor and the biological parents, stating this direction would be part of the minute order, but would not be "in any kind of a system." The court cautioned the parents that if the caregivers brought in proof of harassment or stalking, he would grant a restraining order "in a New York minute." However, the court said if "everybody just leaves everybody alone," there would not be any more problems.

## III

## DISCUSSION

Mother and Father contend there was no substantial evidence to support the court's no-contact order with the Minor, the court exceeded its jurisdiction, and the court violated their constitutional rights by ordering "no contact" with Minor for an indefinite period with inadequate notice or due process. The San Diego County Health and Human Services Agency submitted a letter taking no position on the appellants' contentions with respect to the juvenile court's order and indicated the caregivers or the Minor should retain appellate counsel. No briefs were submitted on behalf of either the caregivers or Minor.

In juvenile dependency proceedings, until the time a petition is dismissed or dependency is terminated, Welfare and Institutions Code[4] section 213.5, subdivision (a) gives the juvenile court exclusive jurisdiction to issue ex parte orders enjoining, in pertinent part, "any person from molesting, attacking, striking, stalking, threatening, . . . , harassing, telephoning, . . . contacting, either directly or indirectly, . . . coming within a specified distance of, or disturbing the peace of the child . . . ." and "excluding any person from the dwelling of the person who has care, custody, and control of the child." The juvenile court may issue similar orders protecting a parent, legal guardian, or caretaker of the child under this section. (*Ibid*.; Cal. Rules of Court, rule 5.630.) Restraining orders under this section are made "upon application in the manner provided by" Code of Civil Procedure section 527 or Family Code section 6300 (Welf. & Inst. Code, § 213.5, subds. (a)), must state a date of expiration (*id.*, § 213.5, subd. (f)), and may remain in effect "no more than three years, unless otherwise terminated by the court, extended by mutual consent of all parties to the restraining order, or extended by further order of the court on the motion of any party to the restraining order."[5] (*Id.*, § 213.5, subd. (d)(1); *In re Jonathan V.* (2018) 19 Cal.App.5th 236, 241-242.)

---

[4] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[5] One of the Legislature's purposes in cross-referencing statutes involving civil restraining orders and domestic violence restraining orders, was to " 'create greater consistency' between different statutes governing protective orders." (*Priscila N. v. Leonardo G.* (2017) 17 Cal.App.5th 1208, 1214, citing Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1596 (2009-2010 Reg. Sess.) p. 13.)

Under Code of Civil Procedure section 527.6, subdivisions (i) and (j)(1), a court may, after notice and a hearing, issue an order prohibiting harassment if it finds by clear and convincing evidence that unlawful harassment exists. The Family Code allows a court to issue an emergency protective order "only if the judicial officer finds both of the following: [¶] (a) That reasonable grounds have been asserted to believe that an immediate and present danger of domestic violence exists, that a child is in immediate and present danger of abuse or abduction, or that an elder or dependent adult is in immediate and present danger of abuse as defined in Section 15610.07 of the Welfare and Institutions Code. [¶] (b) That an emergency protective order is necessary to prevent the occurrence or recurrence of domestic violence, child abuse, child abduction, or abuse of an elder or dependent adult." (Fam. Code, § 6251, see also Fam. Code, § 6250.)

Under these statutes, the juvenile court had jurisdiction to issue orders protecting Minor and the caregivers from the biological parents even though their parental rights were terminated, if there was a sufficient basis for such an order. (See *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1508-1509, 1512 [juvenile court properly issued restraining order against grandmother].) However, after considering the evidence presented, the court determined there was not clear and convincing evidence to support a formal restraining order against Father and Mother as requested. The court stated, "The fact of the matter is they haven't done anything . . . recently enough that qualifies under either the civil harassment or the Family Code sections, so I can't grant it." The court noted the parents' history could justify the caregivers' generalized feelings of fear, but said speculation and "feelings alone [are] not enough" to grant a restraining order. We conclude substantial evidence

11

supported the court's factual findings and the denial of the requests for protective orders. (*In re N.L.* (2015) 236 Cal.App.4th 1460, 1466.)

However, the court went further and ordered "no contact" between Minor and the biological parents. For the same reasons that there were no factual bases to issue the requested restraining orders, there were no factual bases for the no-contact orders with Minor. There was no evidence Minor's physical or emotional safety would be in jeopardy absent a restraining order or other form of no-contact order. (Compare *In re N.L.*, *supra*, 236 Cal.App.4th at pp. 1467-1468, citing *In re C.Q.* (2013) 219 Cal.App.4th 355, 363 [error to include minor in restraining order when mother held educational rights], with *In re A.M.* (2019) 37 Cal.App.5th 614, 619 [restraining order necessary to ensure minor's safety from father who sexually abused child].)

Further, the general "no contact" order for an indefinite period did not give fair notice to the biological parents of the scope and duration of the order. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 890; see also *Camacho v. Camacho* (1985) 173 Cal.App.3d 214, 221.) This contrasts with statutory provisions for restraining orders, which set time limits. (Welf. & Inst. Code, § 213.5, subd. (d)(1) [three years]; Code Civ. Proc., § 527.6, subd. (j)(1) [five years]; Pen. Code, § 136.2, subd. (i)(1) [10 years].) In this case, the child is placed with paternal relatives and there may come a time when one or both biological parents could reconcile with the family and the Minor may wish to have some contact with them without violating the juvenile court's order.

"An existing body of statutory law regulates restraining orders. ' "[I]nherent powers should never be exercised in such a manner as to nullify existing legislation . . . ." ' [Citation, italics omitted.] Where the Legislature authorizes a specific variety of available procedures, the courts should use

12

them and should normally refrain from exercising their inherent powers to invent alternatives." (*People v. Ponce* (2009) 173 Cal.App.4th 378, 384.) "[E]ven where a court has inherent authority over an area where the Legislature has not acted, this does not authorize its issuing orders against defendants by fiat or without any valid showing to justify the need for the order." (*Ibid.*)

" '[T]he use of no-contact orders must be reserved . . . for rare and compelling circumstances . . . .' " (*People v. Ponce*, *supra*, 173 Cal.App.4th at p. 385.) No such compelling circumstance is present here. Although the court's advice that there would be no more problems "if everybody just leaves everybody alone" is manifestly sound, it does not justify a non-specific no-contact order for an indefinite period of time with no evidentiary basis. As such, we reverse the "no contact" portion of the order.

As the juvenile court also noted, a restraining order does not provide a "bulletproof golden seal to keep people from doing bad things[.]" However, the biological parents are on notice that should the caregivers provide evidence that the biological parents are engaging in harassing or stalking behavior, the court is willing and able to issue a restraining order.

Because we reverse the portion of the order prohibiting the biological parents from having any contact with Minor, we need not reach the constitutional issues pertaining to notice and representation.

13

DISPOSITION

The portion of the September 24, 2020 order ordering no contact between Minor and the biological parents is reversed.  In all other respects, the order is affirmed.


O'ROURKE, J.

WE CONCUR:


HALLER, Acting P. J.


DATO, J.