Filed 3/15/22  In re Elena A. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re ELENA A. et al., Persons Coming Under the Juvenile Court Law. | B313654 (Los Angeles County Super. Ct. No. 19CCJP04757) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff, v. MARTHA C., Defendant and Respondent, DAVID A., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant David A.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Respondent Martha C.

_____

After David A. (father) pled no contest to allegations that he had abused his two children and their mother, the juvenile court granted a permanent restraining order prohibiting father from contacting all three of them. Father appeals that restraining order, contending that the juvenile court abused its discretion because it relied upon "nebulous" statements regarding father's purported stalking activities and because it erroneously denied his request to call the children as witnesses at the evidentiary hearing.

A juvenile court may issue a restraining order enjoining anyone from disturbing the peace of a parent or child if a failure to issue such an order might jeopardize their safety. The record here unambiguously demonstrates that father severely traumatized both of his children and their mother over a period of many years. The documented incidents of domestic violence with mother were long-standing and predated both children. Later, he abused mother in front of the children, and, after separation, began abusing the children during weekend visits, which he admitted as part of his no contest plea. Indeed, both children were diagnosed with post-traumatic stress disorder due to father's physical and verbal abuse and they were still receiving psychological treatment at the time of the restraining order

2

hearing. Their therapists opined that visitation with father would be detrimental to their mental health.

Given substantial evidence of the severe and ongoing psychological trauma he caused to both of his children and the mother, the juvenile court did not abuse its discretion in issuing a restraining order.

Although the record contains a statement from father's counsel that he intended to call the children as witnesses at the contested hearing, it does not reflect either that the juvenile court affirmatively denied his request, or what the juvenile court's reasoning for rejecting such testimony might have been. Father has therefore failed to provide us with an adequate record to review, and he essentially concedes this point in his opening brief. Further, in light of the overwhelming evidence of father's abuse and traumatization of his two children, the juvenile court would not have erred in refusing to order their testimony under the circumstances.

Accordingly, we affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. The Family

Father had two children with his wife, Martha C. (mother). Elena A. was born in 2008, and Gabriel A. followed in 2012.

---

[1] Father did not designate the record in the prior appeal as part of the record in this appeal, instead citing to portions of the prior record in his opening and reply briefs. A request for judicial notice would have been more appropriate. (Evid. Code, §§ 452, 455, 459.) In any event, both sides cite to the prior record, so in an abundance of caution we will take judicial notice of the record in the prior appeal on our own motion.

3

When mother and father divorced in 2016, mother took sole physical custody of both children. Father shared legal custody and had the right to regular visitation.

## B. Initial Investigation into Abuse Allegations

On June 6 and 9, 2019, the Los Angeles County Department of Children and Family Services (the Department) received multiple referrals alleging that the children showed signs of physical abuse after returning from weekend visits with father. The children reportedly came home with bruises, scratches, and bloody noses. Gabriel disclosed that father "hit him . . . on his back and on his body." When the children began resisting visits with father, father roughly forced them into his car, causing bruising on their backs. The children told one of the reporting parties that they had also witnessed domestic violence between their parents.

When the Department interviewed the children, they reported that father physically abused them as a form of discipline. They said that father once pulled on Gabriel's ear so hard that the skin broke, causing his ear to bleed. The Department found a corresponding scar on Gabriel's left ear lobe. The children also stated that father had locked Gabriel into a dark closet and, when Gabriel tried to escape, father "barricaded the door with his own body" to keep him trapped. The children said that father would "force feed" Gabriel, attempting to force him "to eat his food within 10 seconds." And Elena said that father "pulled her by the hair and threatened to discipline [her] in the same manner father disciplines [Gabriel]." The children both reported being fearful of their father.

4

The children also confirmed that they had witnessed father physically abuse their mother. Gabriel reported that he had once seen father "choke" mother while holding her against the wall.

Mother admitted that father had been physically and verbally abusive since they first began dating in 2004. She said that he had continued to push, shove, and sexually assault her after their 2016 separation, with the most recent incident taking place in November 2018. Mother had attempted to move away from father to place distance between them, but claimed that when father "threat[ened] to remove the children from her care if mother did not provide him with [her] new home address," she buckled and gave him the family's new address. She said that father would "make . . . unannounced visits to her home to continue to intimidate her and the children." When she attempted to obtain a restraining order against father, her application was denied.

## C.    Jurisdiction Petition

On July 26, 2019, the Department filed a petition requesting jurisdiction alleging that the children were subject to dependency jurisdiction pursuant to section 300, subdivisions (a), (b)(1), and (j) of the Welfare and Institutions Code.[2]

On September 23, 2019, at the jurisdiction hearing, father pled no contest to an amended version of the jurisdiction petition, which alleged three counts.[3] Count a-1 alleged that father

---

[2] Subsequent undesignated statutory citations are to the Welfare and Institutions Code.

[3] Father filed an appeal from jurisdiction and disposition orders pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835. We dismissed that appeal in an order filed June 10, 2020 (B302181).

5

"inappropriately disciplined" Gabriel with a litany of physical abuse, including "str[iking] [him] with . . . father's hands, fists and objects," "pull[ing] and dragg[ing] [Gabriel] by [his] ear[,] causing [Gabriel's] ear to bleed and sustain a scar to [his] left ear lobe," and "put[ting] [Gabriel] in a closet for an extended period of time." Count b-2 alleged that father also inappropriately disciplined Elena by "pull[ing] [her] hair" and "threaten[ing] to hit [her]." Finally, count b-3 alleged that father "ha[d] a history of engaging in physical altercations [with mother] in the presence of the children," including by choking her, holding her against a wall, and pushing her.[4]

The juvenile court ordered mother to retain physical custody of the children and removed the children from father, but it allowed him to have monitored visitation.

## D.    Children Refuse Visitation with Father

On December 5, 2019, the Department reported that it had been unable to facilitate visitation between children and father, as the children repeatedly stated that they did not want to see him. Elena told interviewers that she "does not wish to see her father nor speak with him," because "father [is] not very loving" and "father pretends to be a nice guy but he's actually mean." Gabriel shared that he struggled with "visions of dark shadows at night, episodes of urinating on himself, and difficulty showering alone." He said that he was scared of father, and feared that father would remove him from mother's home.

Initially, the Department was concerned that mother was coaching the children. Accordingly, it instructed all personnel to

---

[4] The amended petition struck all allegations that mother failed to protect the children.

conduct interviews with the children outside of the home and away from mother. Despite these precautions, the children continuously protested the Department's efforts at facilitating visitation. On October 7, 2019, the children repeated that they did not want to see their father. On October 16, the children continuously cried at the suggestion that they visit their father. Elena cried, "Why won't anyone believe me?" When the Department finally convinced the children to see father on November 20, 2019, father was asked to leave after just 15 minutes because Elena burst into tears, "curled herself in a ball," and "turned her face from . . . father."

Both children were diagnosed with post-traumatic stress disorder due to father's physical abuse. One therapist recommended against visitation, stating that the entire family experienced anxiety and fear about father. Gabriel's therapist opined that visits with father would put him at risk of triggering symptoms and be detrimental to his health.

Although mother had enrolled in the protective services required by her case plan, she struggled to overcome the trauma inflicted by years of abuse at father's hands. She reported that she "live[d] in fear continuously," and was afraid that father "will break into their home and take the children away and kill her." Mother confessed that she had given father her current address in an attempt to stop his endless stream of harassing phone calls, which she claimed had gotten her fired from her job.

On December 5, 2019, at an appearance progress hearing, the juvenile court revoked visitation rights with Gabriel, concluding that visits with Gabriel would be detrimental to him. Although the court allowed father to have weekly visitation with Elena, she consistently refused to visit him.

On March 3, 2020, the Department submitted a status review report recommending that mother retain custody. It opined that mother "has displayed protective capacities to ensure the safety of the children, evidenced by[, inter alia, her] efforts to obtain a restraining order against father." The Department also made an unfavorable risk assessment of father, citing his infrequent cooperation with the Department, failure to "demonstrate new skills needed to protect the children," and the fact that he had not been able to repair his bond with the children since the case started.

## E. Continuance due to COVID-19 Pandemic

The next review hearing was scheduled to be held on March 23, 2020. However, due to the onset of the COVID-19 pandemic, the hearing was continued for almost one year, until February 26, 2021.

On February 26, 2021, the Department submitted its next status review report. Father had begun cooperating with the department and had completed parenting classes. Mother had completed her services and was working hard to create a protective environment for the children. However, mother still struggled with traumatic flashbacks due to "what [the family] went through with father."

Although mother said that she would support the children if they decided that they wanted to see father, they both continued to refuse to see him. On February 21, 2020, for example, Gabriel told interviewers that he "d[id]n't want to see [father], he's mean, he hits me, and my mom doesn't hit me." He said that whenever he saw someone who looked like father, he "g[ot] scared and start[ed] speed walking." On April 21, 2020, Elena echoed Gabriel, stating that she did not want any form of

contact with her father because he "[i]s scary, he hurts my brother and me a lot and that's not right." The children's therapists both agreed that visits with father would be detrimental to the children's mental health.

Despite lingering issues with father, the Department concluded that mother had successfully provided a safe home for the children. It recommended that the juvenile court terminate jurisdiction and return the children to mother's sole physical custody, with the option for monitored visitation with father when the children were ready for it.

## F.     Temporary Restraining Order

On April 29, 2021, mother filed her second request for a temporary restraining order (TRO).[5] In addition to father's long history of domestic violence and physical abuse, mother alleged that on three separate occasions in 2020, she saw a car that she believed to be father's following her through her neighborhood. She also claimed that, during the 2019-2020 school year, Gabriel's teacher reported that she saw a man attempting to pick up Gabriel after school, and that she refused to release Gabriel to that man. Mother additionally alleged that both Gabriel and his maternal aunt had seen what they believed to be father's car outside the family house on two occasions in March 2021.

On April 27, 2021, Gabriel corroborated this account with the Department, telling an interviewer that he was scared to do

---

[5] In a prior order, the juvenile court issued a temporary stay-away order between the parents but did not rule on mother's request for a TRO, instead continuing the matter to a contested hearing on April 29, 2021. Mother filed a second, identical TRO request on the day of the contested hearing, as her first TRO request had presumably expired.

his homework near any windows in case his father drove by the house and saw him.

In a last minute information submitted to the juvenile court, the Department reported that mother had been receiving calls from unknown or private numbers attempting to confirm her address and obtain information about her and the children's schedules. The information also reported that, on April 26, 2021, Elena told interviewers that she will be "extremely happy" when their case closes, because she "wo[uld]n't have to see [father], he's caused [her] family a lot of pain and fear."

At the contested hearing on April 29, 2021, minors' counsel informed the court that the children had specifically asked to be put on the restraining order, as "[t]hey are concerned about father knowing where they live and potentially stalking [mother]."

The juvenile court granted mother's request and issued the requested TRO over father's objections, reasoning that it was an appropriate measure because "at this point in time, the kids are afraid."

## G. Permanent Restraining Order and Termination of Jurisdiction

The juvenile court initially set a contested hearing for May 12, 2021, to determine whether a permanent restraining order should be issued against father.

Father attempted to submit hundreds of pages of screenshots from his phone's Google Maps application and printouts of a tracking device that he had allegedly installed on his car. He claimed that these documents showed that he had not driven anywhere near mother's house or the children's school over the claimed time periods.

The juvenile court explained to father's counsel that such documents would be considered inadmissible hearsay if he could not provide a foundation for them by, for example, retaining an expert who could attest to the manner in which these devices record a person's location information. The court granted an additional continuance to June 9, 2021, to give father's counsel the opportunity to perfect this evidence.

Father also asked the juvenile court to order mother and the children to be present in court to be available for in-person testimony, due to father's "belie[f] that the children have been coached by [mother] and will be susceptible to this if the hearing is conducted" virtually.

On June 9, 2021, the matter proceeded to a contested joint hearing to determine whether a permanent restraining order should issue against father, and whether dependency jurisdiction should be terminated.

Minors' counsel asked the juvenile court to terminate jurisdiction only if it granted the permanent restraining order. She later explained that "[i]n light of the anticipation of the supervision of this case concluding, the children became fearful." She informed the court that the children "want[ed] the restraining order, and want[ed] some means of protection past when this court's supervision concludes."

Because the children's position on terminating jurisdiction depended on the issuance of a permanent restraining order, the juvenile court first turned to the matter of the restraining order. After hearing preliminary arguments, the juvenile court rejected all of father's exhibits consisting of the Google Maps screenshots and tracking device printouts, as he had not retained the suggested expert or laid any other foundation that could render

11

them admissible.  It also informed father that, pursuant to Evidence Code section 352,[6] it would disallow the excessive number of witnesses on the list he had submitted.  Father's counsel stated that because "the court has indicated and denied my request, previously, for me to call the children, over our objection," his only witnesses would be mother and father.

During the hearing on June 10 and 23, 2021, father and mother testified.  Father denied surveilling mother and the children, denied knowing where they lived, and denied instructing anyone to follow them on his behalf.  Mother testified regarding the three times in 2020 when she saw a dark car following her, and clarified that she had seen father driving the car on two occasions.

Mother testified that she had attempted to obtain a restraining order against father multiple times, but had been unsuccessful.  After mother saw father following her by car in February of 2020, she said that she wanted to get a restraining order but was told that she couldn't pursue one at that time, and that she would not be granted one because she did not have photographs or other proof that he had been following her.  When she tried to get a restraining order later that year, she said that again the "answer was, no.  There's a pandemic going on.  When I would try to go to court, it was closed.  They wo[uld]n't see me." She testified that she was finally able to request the present restraining order by phone in March of 2021.

---

[6] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)

At the end of mother's testimony, the juvenile court asked father for his next witness. Father's counsel said that he had no further witnesses to call.

After hearing further argument on both the restraining order and on the termination of jurisdiction, the juvenile court terminated jurisdiction and issued a custody order giving mother sole physical and legal custody. The court ordered monitored visitation, but noted that "these children are old enough that they are not going to be physically forced to visit."

With respect to the restraining order, father argued that because he had completed his case plan, which included anger management and domestic violence classes, the domestic violence issues that led to dependency jurisdiction were no longer relevant. The juvenile court disagreed, concluding that "the fact that I'm having this [restraining order] hearing is an indication . . . that the issues have not been ameliorated."

The juvenile court noted that although father "ha[d] completed his programs . . . it appears that there has been no real change. The children are still fearful of the father, and do not want to have anything to do with him." Further, the juvenile court relied upon the allegations of domestic abuse that the court sustained in the initial jurisdiction petition, and on the court's finding that the person "who appears to be stalking [mother] . . . when I look at all of the evidence, it's most likely [father], based upon the evidence of the mother, of his children, of the school." Accordingly, the juvenile court entered a three-year restraining order prohibiting father from contact with mother and the children, apart from court-ordered visitation.

Father timely appealed.

13

## DISCUSSION

### A. The Juvenile Court Properly Issued a Permanent Restraining Order Against Father

Father argues that we should vacate the restraining order because the evidence brought against him did not support its issuance. He contends that his no contest plea to the abuse allegations that led to dependency jurisdiction could not provide a basis for the permanent restraining order, as he had not engaged in any violent conduct in the two years since the allegations were sustained.

After the Department has filed a section 300 petition requesting dependency jurisdiction, the juvenile court may issue a restraining order pursuant to section 213.5. Under section 213.5, subdivision (a), the juvenile court may issue an order enjoining any person from disturbing the peace of the child, as well as that of the child's parent or caregiver. The movant need not provide " 'evidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered the child.' [Citation.] Nor does it require evidence of a reasonable apprehension of future abuse." (*In re C.Q.* (2013) 219 Cal.App.4th 355, 363.) Instead, the juvenile court may issue a section 213.5 restraining order if it determines that " ' "failure to make [the order] may jeopardize the safety of the petitioner." ' " (*Ibid.*)

"In reviewing the issuance of a restraining order under [section 213.5], 'we view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination.' " (*In re Bruno M.* (2018) 28 Cal.App.5th 990, 996-997.) While "[s]everal courts have applied the substantial evidence standard in

14

reviewing the issuance of a restraining order under section 213.5" (*In re N.L.* (2015) 236 Cal.App.4th 1460, 1465), others have applied both the substantial evidence and abuse of discretion standards. (See, e.g., *In re Carlos H.* (2016) 5 Cal.App.5th 861, 866 ["appellate courts apply the substantial evidence standard to determine whether sufficient facts supported the factual findings in support of a restraining order and the abuse of discretion standard to determine whether the court properly issued the order"].) "The practical differences between these two standards in this context are not significant." (*In re N.L.*, *supra*, at p. 1466.)

The record in this case demonstrates that father had severely traumatized his children. Father had a long history of domestic violence with mother, predating both children. He abused mother in front of the children, and, after he and mother separated, began abusing the children during weekend visits. Both Elena and Gabriel had been diagnosed with post-traumatic stress disorder due to father's physical and verbal abuse. They were still receiving psychological treatment for this condition at the time of the restraining order hearing. Each of the children's therapists had advised that visitation with father would be detrimental to their mental health. (*In re A.M.* (2019) 37 Cal.App.5th 614, 619 [restraining order was appropriate where "there was sufficient evidence that any contact between [a father and his daughter] would jeopardize her emotional and psychological safety"].)

Although father eventually completed a series of violence prevention classes and expressed remorse for the pain he had caused to his family, he was unable to successfully complete one visit with the children in two years. Elena and Gabriel repeatedly expressed fear of father and insisted that they did not

15

want to visit with him, even when the Department made efforts to counteract any potential coaching from mother. (Compare with *In re N.L.,* supra*,* 236 Cal.App.4th at pp. 1468-1469 [vacating a restraining order where the Department's reports indicated the child's recent interactions with the restrained parent were favorable, and the child said that she enjoyed visiting the restrained parent] and *In re C.Q.*, *supra*, 219 Cal.App.4th at p. 364 [same, where children "stated they want visits with their father and are not afraid of him"].) Under these circumstances, the juvenile court had ample reason to conclude that contact with father could jeopardize the children's safety.

Father also argues that mother's allegations about him following the family at their home and at the children's school were "strikingly vague, speculative and devoid of evidentiary support." Whatever may be said about the stalking allegations and father's positive progress, these positive steps do not ameliorate the terrible and lingering past trauma he inflicted on mother and his children.

Under either standard of review, the juvenile court properly issued a permanent restraining order against father.

## B. The Record Does Not Adequately Support Father's Claim that the Juvenile Court Denied Father's Request to Call the Children as Witnesses

Father also claims that the court erroneously denied his request to call the children as witnesses during the hearing.[7] He

---

[7] Father suggests that this error also affects the orders terminating jurisdiction and awarding full custody to mother, arguing that the matter should be remanded to the juvenile court for a new hearing at which father could solicit the children's testimony on these issues. However, he has not adequately

argues that this denial violated his constitutional rights to confrontation.

The record supporting this contention is ambiguous. Whereas father's trial counsel asserted that the juvenile court had previously denied his request to "cross-examine" the children, the record does not reflect any argument regarding that issue or the juvenile court's ruling. Indeed, father's opening brief concedes that "[t]he record does not reflect that the court addressed [the] request[ ]." While it is true that the juvenile court indicated at the time of the hearing that it would exercise its discretion under section 352 of the Evidence Code to exclude many of father's witnesses, it did not specifically address father's request to have the children testify. And, when the juvenile court specifically asked father whether he would like to call additional witnesses at the conclusion of mother's testimony, father answered that he would not call additional witnesses and moved to proceed to closing arguments.

As the appellant, father bears the burden of providing an adequate record. (*In re Marriage of Deal* (2020) 45 Cal.App.5th 613, 622 ["Under well-established rules of appellate procedure, . . . the appellant[ ] has the burden to provide an adequate record on appeal"].) Because the record before us does not unequivocally

_____

briefed this argument; his briefs assert, without citation to legal authority, that father was entitled to receive the children's testimony regarding various "statements appear[ing] in the social worker's report for the section 364 hearing." Accordingly, these claims are abandoned. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary"].)

demonstrate that the juvenile court denied father's request, he has failed to establish error. (*People v. Accredited Surety & Casualty Co.* (2019) 34 Cal.App.5th 891, 900 [" ' "Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant]" ' "]; see also *In re Jaime R.* (2001) 90 Cal.App.4th 766, 772 [a parent asserting a violation of a fundamental constitutional right " 'the parent must also show there was a "determinative difference" in the outcome of the proceeding by reason of the parent's lack of counsel, such that the proceeding was rendered fundamentally unfair to the parent' "]; *Ward v. Litowsky* (1970) 5 Cal.App.3d 437, 440 ["If appellant wished us to consider whether the alleged [error] prejudicially affected the [proceedings], [he] should have presented us with a record which included [it]"].)[8]

---

[8] Even were we to reach the merits of this argument, we would reject it. A parent's right to call their child as a witness in a dependency case is not absolute. (*In re Jaime R.*, *supra*, 90 Cal.App.4th at p. 771.) To the contrary, the juvenile court may refuse to honor such a demand if it would traumatize or psychologically damage the child, and the child's testimony is unnecessary. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1087.) Father's speculation that the children could have testified in his favor with regard to the permanent restraining order is contradicted by the overwhelming evidence that his children feared him and continuously expressed that they did not want any contact with him.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED


CRANDALL, J.*


We concur:


ROTHSCHILD, P. J.


BENDIX, J.


---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


19