Filed 2/8/23  R.F. v. W.F. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| R.F., | B316013 |
| Appellant, | Los Angeles County Super. Ct. No. 21STFL06027 |
| v. | |
| W.F., | |
| Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lynn H. Scaduto, Judge.  Affirmed.

Pamela Rae Tripp for Appellant.

Law Office of Oscar Acevedo and Oscar Acevedo for Respondent.

————————————

A father challenges a domestic violence restraining order against him.  The order protects his child and the child's mother.

We affirm. The order was no abuse of discretion. We also reject the father's claim the trial court acted as an advocate and not an impartial arbiter. Undesignated statutory references are to the Family Code.

## I

The mother, representing herself, sought a restraining order after a confrontation with the father in May 2021. According to the mother's declaration, the father erupted after she gave their daughter—then three years old—a gummy vitamin. The father "was infuriated" and began screaming at the mother. He had asked her not to give these gummies to the child. He told her she was " 'going to have the biggest problem of [her] life' " if she did it again. The mother knew what this meant: the father kept a gun by his bedside (in an unlocked drawer) and had threatened to kill her with it many times. She was scared for her life and fled the house later that day with the child.

The mother's declaration addressed other incidents with the father over the past year. The father monitored her calls, messages, and pictures. Once he took her phone without permission, pushing her against a wall so hard she had trouble breathing. She tried to escape, but he continued to pin her against the wall and stomped on her foot. When she broke free, he threw the phone at her and broke it. She had trouble walking normally due to the pain in her foot. Another time, the father came home furious when his car stalled. He stormed into the house yelling, made his way to the mother (who was in the bathroom), and slammed the bathroom door into her face, which caused swelling. She described how he would grab and squeeze her forcefully and would not stop when asked. Once he screamed at her and called her an "idiot" in front of the child; then he took

the child outside, continued to scream and demand that the mother follow him, pushed the child away when the mother refused to come out, and slammed the front door with enough force to shatter its glass.

The mother's declaration detailed other aspects of life with her husband: how he restricted her access to finances and would not permit her to work; how he would abuse her verbally and call her names regularly; and how she feared his "physical and verbal attacks[.]"

The father submitted an extensive responsive declaration that denied the mother's claims of abuse and control, claimed the mother was the aggressor in their family, and maintained video evidence "disproves every claim that Respondent has made in her request[.]"  (The father sought custody shortly before the mother sought a restraining order, so the mother often was referred to as "Respondent" in the proceedings.)

The mother obtained a temporary restraining order requiring the father to stay away from her and the child (among other things) and provided for no visitation pending the hearing on the mother's request for permanent relief.

The mother testified first at the hearing.  Her testimony about the incidents was generally consistent with her declaration.  The court asked the mother many questions.  The court had alerted the parties at an earlier hearing that it would ask questions.

The father's mother testified next.  Her testimony about the bathroom incident contradicted the mother's.  She described her son and his wife as a happy and loving couple.  The grandmother confirmed her son had borrowed a gun "when all of the riots were

3

going on," and had returned it a few weeks before the July 2021 hearing.

The father began testifying near the end of the court day. At the resumed hearing, the mother did not appear. The court proceeded with the father's testimony, which contradicted the mother's story. The father's counsel offered many exhibits, including videos from the Ring cameras positioned in the child's bedroom and outside the front door of the home; messages between the spouses; and pictures.

After the father finished his direct examination, the court asked questions. The father confirmed he had been convicted of several drug-related felonies many years before and had been told he could not possess a firearm. The father also confirmed the child was born in Mexico and had lived there (with the mother) for almost two years, which contradicted one of his declarations.

During the father's testimony, the trial court learned the mother had not joined the hearing remotely because she could not get online. The mother arrived at court for the afternoon session and asked a couple questions of the father, despite missing his testimony. The parties made some concluding remarks, and then the court ruled.

The court's oral ruling is thoughtful and extensive. We quote the bulk of it here:

"[T]he standard here is whether the Respondent has met her burden of proof proving by a preponderance of the evidence that there have been one or more acts of domestic abuse by the Petitioner. The conclusion of the Court is that she has.

"I think Mr. Land [the father's counsel] correctly identified this is a case that comes down to credibility. I believed

4

Respondent when she said Petitioner squeezed her hand tightly and said 'But I love you so much,' that he stomped on her foot and broke her phone because he wanted to look at it and she wasn't complying.

"I believe that he showed her the firearm and said 'watch out.' That's paraphrasing, but 'watch out.' I think, Mr. Land what you identified as inconsistencies I largely see as sort of trivial, almost hyper-literal differences.

"Petitioner hit so hard on the idea that this porch video showed that nothing at all -- nothing at all concerning had happened on I think May 30th was the date. It was obvious to me from the video itself and the transcript that Mr. Land provided that that video did not tell the whole story.

"So Petitioner quibbles over what she describes as the office is actually full of exercise equipment for her. All that's in there is a printer. Oh, but I did go in there to get some documents right around the time that thing was happening.

"So there was definitely a downplaying, sort of an attempt to focus the Court on the video that I don't think told the whole story at all.

"Another example of what I would describe as sort of a hyper-literal attempt to impeach the Respondent was that the video, the transcript of the video, showed Petitioner calling Respondent an idiot. 'You're like a child trying to be a parent.'

"Respondent's mother, according to Petitioner, texted her later in the day and said -- I'm paraphrasing -- 'My daughter is not stupid.' And Petitioner's reaction was 'I never called her stupid.' Well, you called her an idiot. It's on video.

"So the idea that there was verbal abuse I think was well documented.  It did not appear that there was physical abuse on May 30th.  Respondent testified in fact that there wasn't.

"What I think we had here is a pattern of controlling behavior that got underway when Respondent left Mexico and came to the United States in September of 2019.

"She had no driver's license.  Her immigration status was far weaker than Petitioner's, obviously, as an American citizen.  She didn't know the country, English.  While she has some knowledge of English, it's clearly not her first language.

"The text messages that Petitioner provided where Respondent described what she had done at the doctor in Mexico in November of 2019 show that her English is marginal, I think we could say, that her written English is marginal.

"There's also the big picture.  Why would she flee the house, leaving behind all of her daughter's treasured items, her blanky, her crown, her high-heeled shoes that she loves?  Why would mother flee the house if something scary wasn't happening there?

"I do think looking at -- I spent time over the lunch hour reviewing all of the communications that Petitioner had admitted into evidence this morning.  Clearly there was a honeymoon phase when Respondent was still living in Mexico.  Petitioner was traveling back and forth.  Lots of loving text messages, sexy text messages, 'Let's have a baby,' all of that.

"Something changed such that after Respondent arrived here with the minor child in September of 2019, within two months she was running away from the Petitioner in Mexico and saying, 'I am not coming back.  I am staying here.  I am going to live with my mom and go to school.'

6

"I asked Petitioner what would she have to gain from leaving the home where she was living with her daughter and your daughter, no job, no driver's license, I think still today?  A relatively low-level immigration status here in the United States.  Why would she do that?  That big picture, in my view, only adds credibility to her account of the relationship between the parties.

"I didn't understand Respondent to say, and I don't think it is the case, that Petitioner was delivering body blows or pointing firearms on a daily basis.  But I think once Respondent got to the United States, Petitioner had her.  He had control, and that at times he enforced his will with threats or with acts of physical aggression.

"The long and short of it is I think Respondent has met her burden of proving that there have been one or more acts of domestic abuse between the parties.  I find that a restraining order should be in place between the parties.

"The firearm is gravely concerning to me.  As I mentioned in our last hearing date, I was very concerned by Petitioner's statement in his June 21st responsive declaration that 'I don't have any guns at my house.'  Right away I said to Mr. Land, 'Maybe he's got it in his pocket.  Maybe it's in his glove compartment.'

"Petitioner's mother's testimony, in my view, corroborated Respondent's account of when the firearm was in the house.  The fact that it seems, at least from what I can tell, the Petitioner, for other reasons, due to a prior criminal conviction, was not allowed to have a firearm only makes it all the more concerning that there was one in the household for what sounds like almost a one-year period, if I am understanding the chronology correctly.  Black Lives Matter in spring of 2020 to I think Petitioner's

7

mother said just a few weeks before the hearing where she testified.

"My impression is Petitioner's mother's testimony was that she would do anything for him. I suspect he could get that firearm in a heartbeat. So the stakes here seem very high. The time when a relationship is coming apart can be very dangerous."

The court granted a two-year permanent restraining order on the same terms as the temporary restraining order, with an exception for monitored visitation between the father and the child. Mother would have sole legal and physical custody.

II

The father asserts "no reasonable judicial officer could have issued a permanent restraining order" here. He makes three claims on appeal: (1) the trial court abused its discretion in issuing the order, (2) insufficient evidence supports including the child in the order, and (3) the trial court was partial and engaged in judicial advocacy.

On the first issue, the trial court's ruling was reasoned and supported by substantial evidence. (See *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1143 (*M.S.*) [appellate court reviews order granting a domestic violence restraining order for abuse of discretion and applies the substantial evidence rule to the trial court's factual findings].) In argument, the father's counsel conceded this was an "extremely difficult" case of "he said, she said." After reviewing the entire record, we cannot say the trial court exceeded the bounds of reason in believing the mother. (See *In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702 (*Fregoso*).)

Courts may issue restraining orders under the Domestic Violence Prevention Act (the Act) (§ 6200 et seq.) upon

8

"reasonable proof of a past act or acts of abuse."  (§ 6300; *J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 641 (*J.H.*).)  They have broad discretion in making these orders.  (*M.S.*, *supra*, 76 Cal.App.5th at p. 1143.)

The evidence we have outlined above is sufficient to find past abuse.  (See § 6203, subd. (a)(1) & (3) [defining "abuse" to include placing a person "in reasonable apprehension of imminent serious bodily injury" and intentionally or recklessly causing or attempting to cause bodily injury].)  It shows acts by the father that led the mother to fear for her life and to flee with her child.  The mother did not need physical evidence of the father's abuse.  (See *Fregoso*, *supra*, 5 Cal.App.5th. at p. 703 ["The testimony of one witness, even that of a party, may constitute substantial evidence."].)

Our job is not to reassess the parties' credibility or to reweigh the evidence.  (*M.S.*, *supra*, 76 Cal.App.5th at p. 1144 ["We accept as true all evidence tending to establish the correctness of the trial court's findings and resolve every conflict in favor of the judgment."]; *id.* at p. 1145 ["we cannot reweigh the evidence or resolve evidentiary conflicts"].)

The father leans heavily on *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249.  But unlike *S.M.*, substantial evidence shows this case involves more than a single episode of name-calling and badgering.  (*See id.* at pp. 1258, 1265–1266.)  The mother in *S.M.* also conceded the father never had threatened to hurt her or been physical with her before the disputed episode.  (*Id.* at p. 1258.)

On the second issue, there was good cause to include the child in the restraining order.  (See *M.S.*, *supra*, 76 Cal.App.5th at p. 1144 [good cause standard based on the totality of the circumstances applies to the inclusion of family members in a

domestic violence restraining order].)  The record shows the father's physical and verbal violence reached the child.  The mother testified the father pushed the child during two conflicts, yelled at her in front of the child during the most recent conflict, and routinely insulted her in the child's presence.  The mother's declaration states the father "has been violent towards me in front of [the child]" and "verbally abuses our child.  He regularly screams at [her] calling her a 'criminal,' 'asshole,' and a 'bitch.' "

Other evidence in the record underscores the father's volatility and shows he—and anyone in the house, including the child—had easy access to a gun, despite the father at one point being told he could not have a firearm.

*In re C.Q.* (2013) 219 Cal.App.4th 355 does not help the father.  That dependency case involved evidence the children wanted visits with their father, did not fear him, and claimed they either did not witness or did not know of domestic violence.  (*Id.* at pp. 359, 361, 364.)  The appellate court reversed the restraining order as to the children after concluding the evidence did not show their safety was in jeopardy (*id.* at pp. 357, 364–365), which is not the standard here.  (See *J.H.*, *supra*, 63 Cal.App.5th at pp. 641–643 [noting *C.Q.* concerned restraining orders issued under the Welfare and Institutions Code and concluding restraining orders issued under the Act do not require a showing of potential jeopardy to the child's safety].)

The father asks us to take judicial notice of custody and visitation orders from the past year in a different case before a different judge granting him shared custody of the child and significantly more visitation rights.  We grant his requests.  But these orders do not show the August 2021 restraining order issued in this case was an abuse of discretion.

10

On the third issue, the record shows the court posed questions to all of the witnesses, asking many questions of both the mother and the father.  This is permissible under the family law rules.  (California Rules of Court, rule 5.113(g).)

This case is nothing like *In re G.B.* (2018) 28 Cal.App.5th 475, cited by the father, where the juvenile court "crafted, asserted, and then adjudicated allegations against [a nonoffending parent] based on a factual and legal theory not raised in the original dependency petition and opposed by the [social services agency]."  (*Id.* at p. 489.)

This trial judge was not an advocate.  The court was trying to determine the facts in a hotly contested case where one litigant had a language barrier, technology issues, and no attorney.  (See *Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420, 423 [recognizing litigants in domestic violence proceedings are often vulnerable and unrepresented, which requires judges to play a far more active role in developing the facts].)

## DISPOSITION

We affirm the permanent restraining order and award costs to the mother.

WILEY, J.


We concur:


GRIMES, Acting P. J.



VIRAMONTES, J.

11